RON MATUSALEM & MATUSA OF FLORIDA, INC., a Florida corporation, Plaintiff–Counterdefendant, Appellant,

v.

RON MATUSALEM, INC., a corporation of the Commonwealth of Puerto Rico, and United Liquors Corporation, a Florida corporation, Defendants–Counterplaintiffs, Appellees,

Manuel A. Guarch, Jr. and Luisa Alvarez Soriano, Counterdefendants.

No. 88–5042.

United States Court of Appeals, Eleventh Circuit.

May 23, 1989.

Michael C. Cesarano, Miami, Fla., for plaintiff-counterdefendant, appellant and amicus curiae, for Matusalem, Ltd.

Rhea P. Grossman, Miami, Fla., Jack M. Coe, Lee, Schulte, Murphy & Coe, P.A., Coral Gables, Fla., for defendants-counterplaintiffs, appellees.

Before FAY and ANDERSON, Circuit Judges, and ALLGOOD *, Senior

---

* Honorable Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

District Judge.

FAY, Circuit Judge:

Plaintiff Ron Matusalem & Matusa of Florida, Inc. ("Matusa") appeals from a judgment of the United States District Court for the Southern District of Florida holding that the defendant Ron Matusalem, Inc. ("Inc.") had not breached its sub-franchise contract, and that the plaintiff's termination of the sub-franchise was invalid. The parties to the dispute are comprised essentially of two sides of a family descended from the family patriarch, who was the owner of a rum company in Cuba. Matusa and Inc., which are separate corporate entities, operated the rum company for many years as a family business. The business relationship was formalized by contract, but the companies interacted on an informal basis at times ignoring the strict wording of the contract where it suited their mutual interest. However, after an unfortunate falling out between the two sides of the family, described by the district court as a "family squabble," the business relationship became adversarial. Matusa, the owner of the company trademarks, demanded that Inc. comport to the letter of the written agreement. When Inc. refused to comply, Matusa sought to terminate Inc.'s sub-franchise. Matusa brought suit seeking injunctive relief and damages for trademark infringement under the Lanham Act, 15 U.S.C. § 1051 et seq. (1982), breach of contract, and other state law claims. The district court found that Inc.'s actions did not amount to a terminable breach and Matusa appealed. Because we believe that the record amply supports the findings of the district court, we affirm.

## I. *Of Vanilla Beans and Prune Macerations*

In 1872 a Cuban business was established to manufacture a high quality rum under the name "Ron Matusalem." In 1944, Alvarez, Camp y Cia obtained a United States trademark registration for the trademark Matusa. In 1948, Ron Alvarez Camp, S.A., assignee of Alvarez, Camp y Cia obtained a registration for the trademark and corporate logo Matusa.

Prior to his death in 1955, Claudio Alvarez Lefebre, majority owner of Ron Alvarez Camp, wrote in a book his secret formulas for making rums sold under the trademark Ron Matusalem. Following his death, ownership of the business and the trade secrets passed to his wife and children. In the late 1950's and early 1960's the family members fled from Cuba to Miami, bringing the trade secrets with them.

In 1961, two corporations were created to carry on the family's rum making enterprise: Matusa, a Florida corporation, was incorporated on May 4, 1961; and Compania Licorera Oriente ("Licorera"), a Puerto Rican corporation, was incorporated on May 9, 1961. On May 16, 1961, Ron Alvarez Camp granted a franchise to Licorera, giving it essentially worldwide rights to make and sell Ron Matusalem rums under Ron Alvarez Camp's trademarks. The franchise provided that the nature and quality of the rums sold under the trademarks were subject to the control of Ron Alvarez Camp, and gave Ron Alvarez Camp the right to terminate the agreement upon the failure of Licorera to comply with its provisions.

On June 14, 1961, Ron Alvarez Camp assigned to Matusa all of its trademarks worldwide, its trademark registrations and good will, and all of its rights under the franchise agreement with Licorera. The effect of this assignment was to substitute Matusa for Ron Alvarez Camp as the trademark and trade secret owner for all legal purposes outside of Cuba. In 1964, Ron Matusalem, Limited ("Limited") was incorporated in the Bahamas, and on October 20, 1964, Licorera granted it an exclusive sub-franchise to manufacture and distribute Ron Matusalem rums in all countries of the world except Cuba. In the sub-franchise agreement, Matusa was given the rights to receive royalties, to control the quality of the rums produced by Limited, and to terminate the sub-franchise for specific breaches. Although Limited's territories were exclusive and worldwide (excepting only Cuba), Licorera reserved the right to grant similar sub-franchises in the future covering any country or territory except the British Isles, Europe, Canada, Bermuda

and the Bahamas. If any such sub-franchise were granted, that franchised territory would be excluded thereafter from Limited's sub-franchise.

In 1967, Inc. was incorporated in Puerto Rico and Licorera granted it a sub-franchise covering all countries of the world, with the exception that Inc. could not use the trademarks in Cuba, the British Isles, Europe, Canada, Bermuda or the Bahamas without the permission of Limited. Under the terms of the sub-franchise, Inc. was to pay to Matusa royalties equaling ten percent of its annual net profit. As in the sub-franchise granted to Limited, Matusa was expressly given the right to terminate Inc.'s sub-franchise for specific breaches of its terms.[1]

In 1978, United Liquors Corporation ("United") was incorporated. United took over many billing and invoicing functions that Matusa had previously performed for Inc. in the United States.[2]

From the time of the incorporations of Matusa, Licorera, Limited, and Inc., until September, 1981, all the corporations were operated under the coordinated direction of three people; Gerardo Abascal, Sr., Gerardo Abascal, Jr., and Ricardo Abascal. Gerardo Sr. is the son-in-law of Claudio Alvarez Lefebre. Gerardo Jr. is his son and Ricardo is his brother. Between mid-June and late September, 1981, the Abascals were dismissed from their positions as principal officers of Matusa, Licorera and Limited. The Abascals retained control over Inc., while the plaintiff's side of the family controlled Matusa, Limited and Licorera.[3]

## II. *The Pits*

Until the time of the falling out between the two sides of the family, Matusa, Inc., and the other companies were apparently run as one family business, described by the district court as a "loose knit strada of corporations." (R7–160 Ex. 1–4). However, beginning in late 1981, the loose knit strada fell apart at its corporate seams. The resulting factions, Inc. and United on the one hand and Matusa, Licorera and Limited on the other, ceased to deal with each other as family members with a common interest. On October 15, 1982 Matusa gave written notice to Inc. of a number of purported breaches of its obligations under the franchise agreement. The letter stated that if Inc. failed to rectify its noncompliance with the sub-franchise agreement within thirty days as provided for in the contract, Matusa would terminate the sub-franchise.[4]

Matusa asserted several grounds for termination of the sub-franchise. First, Inc. began making its own substitute formula using commercially purchased extracts and concentrates in place of the prune and vanilla bean macerations which Matusa maintains are indispensible components of the secret formula required to make Matusalem rums. Second, the Abascals incorporated a Canadian corporation, "Ron Matusalem Canada, Ltd.," for the sale and distri-

---

1. In its oral findings of fact and conclusions of law, the district court noted that the Licorera corporation was "kind of an empty shell." (R7–160 Ex. 1–6). Although Licorera granted the sub-franchises to the companies which actually make and sell the product, Matusa was given the right under the sub-franchise agreements to receive royalties and the sole power to terminate the sub-franchises.

2. The court treated Inc. and United as a single party for purposes of this litigation.

3. The plaintiff's side of the family, which owns a 59 percent interest in Limited, is comprised of the descendants of Claudio Alvarez Lefebre through his daughter Dora. In June, 1981 Ricardo Abascal fired Dora's husband, Rolando Vazquez Milla, from his position as the supervisor of quality control for Matusa before the

Abascals were dismissed as the principal officers of Matusa. These events resulted from the falling out between the two sides of the family. Rolando and Dora's children, Nela, Rocky and Manny comprise the side of the family which now controls Matusa.

4. The sub-franchise agreement between Licorera and Inc. provides, in part, as follows:

8. Upon failure of [Inc.] to comply with the provisions of ... this Sub–Franchise Agreement, ... Matusa, the owner of such trademarks, shall have the right to terminate this Sub–Franchise Agreement by giving 30 days written notice of its intention to terminate this Sub–Franchise Agreement; provided, that this Sub–Franchise Agreement shall not be terminated if within such 30–day period [Inc.] takes steps to rectify its non-compliance.

bution in Canada of a liqueur under the Matusalem trademark and logo.[5] Matusa claimed that the sales in Canada violated the sub-franchise agreement because Inc.'s franchise territory did not encompass Canada, and because Inc. was required to obtain Limited's permission to make such sales and to pay royalties to Matusa, both of which it failed to do. Third, Matusa claimed that Inc. effectively repudiated its franchise rights by filing a United States trademark application to register "Ron Matusalem," claiming that it was the owner of the trademark, and by refusing to assign or abandon its application to register Matusa's trademark once Matusa demanded that it do so.

On July 19, 1982 Matusa sent Inc. a letter stating that its sub-franchise was terminated for failure to cure the alleged breaches within the 30 day period. Thereafter, in an effort to cut off the defendants' business, Matusa notified United's suppliers that the sub-franchise had been terminated. Matusa filed suit on August 18, 1983 seeking to enjoin Inc. and United from making any further use of the Matusalem trademarks. Matusa also sought damages and an accounting for breach of contract, trademark infringement, unfair competition, injury to business reputation and misappropriation of trade secrets. After an eight day bench trial, the district court issued oral findings of fact and conclusions of law. The court concluded that the plaintiff had failed to prove any violations by the defendants sufficient to warrant the termination of the sub-franchise. The court ruled that the franchise would be enforced, that Inc. was thus required to act in strict compliance with its terms, and that Inc.'s pending trademark applications must be transferred to Matusa. The court also ruled that sales made through Limited in Central America must stop because that territory belongs to Inc. under its sub-franchise. To the extent that money had been invested in the production and sale of Matusalem rums in Latin America by Matusa or one of its licensees, the court ruled that Inc. would have to reimburse the developer

for these expenses. Matusa appeals, contending that the district court erred in finding that no terminable breach of the sub-franchise occurred. Matusa also claims that the court was without jurisdiction to order that all sales of Matusalem products by parties other than Inc. cease, because the enforcement of that order would affect parties not before the court. We now address each of these issues in turn.

### III. *The Wrinkles*

#### A. Standard of Review

In examining the findings of the district court, we note the factual nature of the dispositive issues before us. A finding of fact by a trial court may not be reversed by an appellate court unless "clearly erroneous." Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). In this case the court was asked to determine whether the evidence presented to it established a breach by the defendant of its sub-franchise contract.

The Supreme Court has held that Rule 52(a) "does not divide facts into categories; in particular, it does not divide findings of fact into those that deal with 'ultimate' and those that deal with 'subsidiary' facts." *Pullman–Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). We have held that a district court's "application of the legal standard ... to the facts of the case ... is reviewed under the 'clearly erroneous standard.'" *Daley v. United States*, 792 F.2d 1081, 1086 (11th Cir.1986) (quoting *Miller v. United States*, 587 F.2d 991, 994 (9th Cir.1978). The question of whether a contract has been breached is such an issue of ultimate fact, requiring the application of a legal standard to a given set of facts. *See Cabriolet Porsche Audi, Inc. v. American Honda Motor Co.*, 773 F.2d 1193 (11th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986). Thus we apply the clearly erroneous standard to the district court's find-

---

5. Following their receipt of Matusa's letter, the Abascals changed the name of the Canadian corporation to "Roncoco Canada, Ltd."

ing that the sub-franchise was not breached.

## B. The Secret Formula

As grounds for termination of the franchise, Matusa claimed that Inc. had failed to make the rums "strictly in accordance with the secret formulas and processes" called for in the franchise agreement. Matusa claimed that some time after the Abascals were fired by Matusa and Limited, the defendants began to use commercially purchased extracts and concentrates instead of the natural prune and vanilla bean macerations required to make "Formula # 2." Until this time, Inc. had purchased the formula from Limited.

Matusa alleges that Inc.'s actions amount to a breach of the sub-franchise contract as a matter of law. Matusa also claims that the defendant's continued use of the trademark after receiving notice of termination constitutes federal trademark infringement under the Lanham Act, 15 U.S.C. § 1114 (1982), as well as several violations of state law, entitling Matusa to damages and an accounting.

It is clear that a trademark owner has a duty to exercise control and supervision over the licensee's use of the mark. *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 124 (5th Cir. 1973).[6] Thus courts have held that a franchise may be terminated for breach of contract where the franchisee sells a product under the trademark owner's mark which is not made or approved by the trademark owner. *See Amoco Oil Co. v. D.Z. Enters., Inc.*, 607 F.Supp. 595 (E.D.N.Y.1985). In this case it was properly an issue for the trier of fact whether the franchisee's actions amounted to trademark infringement and a breach of contract warranting termination.

It is an established principle of contract law that an injured party may terminate a contract for breach only if the breach is "material." *Hensley v. E.R. Carpenter Co.*, 633 F.2d 1106, 1109–10 (5th Cir.1980). Whether a breach is material is an issue of fact, *id.*, and "the general inquiry is whether the injured party has received substantially what he bargained for." *Ferrell v. Secretary of Defense*, 662 F.2d 1179, 1181 (5th Cir.1981). Courts should also look to factors such as the extent to which the injured party can be compensated for the benefit of which he was deprived, the extent to which the party failing to perform will suffer forfeiture due to the contract's termination, and the extent to which the behavior of the party failing to perform comports with standards of good faith and fair dealing. Restatement (Second) of Contracts § 241 (1981). In addition, courts should "encourage the parties to keep the deal together by allowing the injured party to terminate the contract only after an appropriate length of time has passed." Farnsworth, *Contracts* § 8.15 (1982).

Assuming that Inc. substituted commercial extracts for the natural prune and vanilla bean macerations required to make its rums, it is impossible to establish from the record any time frame for these events. Federico Abascal (Vice President of United and son of Ricardo Abascal) testified that Inc. began making its own macerations at the beginning of 1983, using "the beans and the prunes" (R13–1119), and that this continued until about one year before trial. Gerardo Abascal testified that when the formula bought from Limited ran out in 1983, Inc. began to make its own formula.[7] James Hammond, the general manager of the bottler, Jacquin–Florida Distilling Company, testified that Jacquin had equipment and facilities for macerating whole prunes

---

**6.** The district court correctly noted that
[t]he Matusa corporation has the absolute right to control the trademarks, the trade names and the manner of making the rum. (R7–160 Ex. 1–7 ).... they do have the right to insist that it be done the way they want it to be done. *Id.* at 14.

**7.** Abascal testified as follows:
We bought [the formula] from Limited until I think we ran out about '83.... Later on

when this was created, United, we would ship to United the formula that was brought in from the Bahamas, from Limited.
So not until 1983 is when we completely ran out of formula, I still have a little bit left in Puerto Rico, until we ran out of formula that we start duplicating what was already previously done in the Bahamas. (R8–75).

and vanilla beans on its premises, but could not recall if the equipment had been used. (R9–307, 308).

The district court found that Inc.'s deviation from the letter of the secret formula was so minor as to render any finding of injury to Matusa negligible:

> With regard to the use of the formula, the only evidence or the only conclusion that I can draw is that the formula used by Inc. and United was substantially similar to the formula, the original formula that the grandfather put in the book. Both parties have exchanged these formulas and I have heard nothing to indicate that they are not similar.
>
> With regard to the substituting of extracts for the original vanilla and prune macerations, it's difficult to tell from this evidence if there is any change in the ultimate results.

(R7–160 Ex. 111–12). Thus, although the plaintiff presented evidence that Inc. used commercial extracts instead of macerations in the making of Matusalem rums, the district court found no trademark violation and no breach of contract:

> [W]hether or not there was a violation of the trademark, I don't find on these facts such a violation.... [C]onsidering all the facts and circumstances, I don't find a wilful violation of the trademark, nor do I find any attempt at a false labeling, false designation or unfair competition.

(R7–160 Ex. 1–10–11). In light of the inconclusive nature of the plaintiff's evidence as to the extent and duration of Inc.'s alleged violation of its quality control obligations, and keeping in mind that questions of credibility and the weight to be given testimony is peculiarly a matter for the trier of fact, we will not second guess the trial court's ruling that the plaintiff failed to meet its burden of proof.[8]

### C. Other Trademark Claims

Matusa claims that the district court erred in failing to find that Inc. repudiated the franchise agreement by filing a United States trademark registration for the trademark "Ron Matusalem," and by its refusal to assign or abandon its registration subsequent to the October 15, 1982 letter from Matusa demanding such action. Inc. filed the application to register the trademark "Ron Matusalem" in the United States on August 3, 1981. Matusa demanded in its letter that Inc. abandon or assign to it Inc.'s pending application.

■ Rather than finding a repudiation of the franchise, the district court found that Inc. had filed at a time when it was acting for the benefit of Matusa:

> I think that the efforts to secure the trademarks and trade names, whatever registrations, initially were done at a time when there was peace and tranquility in the family and were done on behalf of the welfare of everyone. In fact, I have heard testimony ... that that was always their intention, to secure these for the benefit of Matusa. (R7–160 Ex. 1–10).

We find nothing in the record to contradict this finding. The plaintiff presented no evidence suggesting that it did not agree to the filing prior to October 15, 1982. The district court found that the defendants previously had been successful in securing a trademark registration in Puerto Rico, and "it was the consensus of feeling that that registration would benefit an application to Washington to get further registrations." (R7–160 Ex. 1–10). The record supports the district court finding that Inc. did not repudiate its sub-franchise by filing a trademark registration on behalf of itself and Matusa.

■ A closer question is whether Inc.'s refusal to assign or abandon its pending application after October 15, 1982 constitutes trademark infringement. Some courts have held that a licensee's registration of its licensor's mark may cause confusion, and thus constitute trademark infringement. *See, e.g. Snelling & Snelling, Inc. v. Dupay Enters., Inc.,* 125 Ariz. 362, 609 P.2d 1062 (Ct.App.1980). However, the

---

8. The court did *not* hold that the franchise agreement permitted Inc. to depart from the requirements of the trademark owner. Inc. is required by the sub-franchise agreement to use the secret formula, whether it be purchased from Matusa or Limited, or made by Inc. (R7–160 Ex. 1–13).

district court ruled that given the equities involved, the refusal could not be grounds for termination of the franchise. "[T]heir refusal to withdraw the petition for a trademark was arbitrary, but both sides were being arbitrary at this time. Both sides were acting like spoiled children and insisting on any leverage they could get hoping to have an edge." (R7–160 Ex. 1–17). "[T]o the degree that this case involves equity, both parties had unclean hands...." *Id.* at 18. We have held that the application of the doctrine of unclean hands in a trademark case lies within the sound discretion of the district court, *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.,* 697 F.2d 1352, 1355 (11th Cir.1983), and we decline to disturb the district court's ruling.[9]

██ Although Inc.'s action with regard to the trademark application did not infringe Matusa's trademark, the district court ruled that "any pending applications or any trade names that were acquired ... would be deemed to be and should be transferred to Matusa for their ownership." (R7–160 Ex. 1–10). Because the trademark clearly belongs to the plaintiff, we agree that the order is proper.

██ We are similarly unpersuaded by the plaintiff's claim that Inc.'s sales of the "Roncoco" liqueur in Canada constituted a repudiation of its franchise as a matter of law. The franchise prohibits Inc.'s use of the Ron Matusalem trademark in several countries, including Canada, except by agreement with Limited. The district court made a factual finding that at the time the Canadian venture began, it was done for the benefit of all parties concerned. The court stated that it was a business opportunity that was made available to the part of the family that was running the corporation at that time. (R7–160 Ex. 1–21). Because the label was designed to resemble the Ron Matusalem trademark, the court ordered that Inc. pay Matusa the ten percent royalty required in the franchise. Again, we find nothing in the record sufficient to disturb the district court's finding that the incorporation of the Canadian com-

pany was done for the benefit and with the acquiescence of both parties. By the time Matusa sent Inc. its "notice of breach" letter in 1982, the atmosphere of mutually beneficial business dealings had disappeared. As the court stated, "all the rules have changed. This is no longer a family, it's two different corporations, so you have got to start enforcing these things like corporations instead of family." (R7–160 Ex. 1–20).

This is not to say that the district court did, or might write a new contract for the parties where the language of the contract is unambiguous. *Haenal v. United States Fidelity & Guar. Co.,* 88 So.2d 888 (Fla. 1956); *Home Dev. Co. v. Bursani,* 178 So.2d 113 (Fla.1965). Rather, it simply acknowledged that the franchise agreement could no longer be treated as an informal understanding purporting to lend legal authority to whatever the two parties chose to do at any given time. Where both parties had seemingly ignored the letter of the contract throughout the course of the franchise, the district court was understandably reluctant to allow Matusa to terminate Inc.'s franchise on the grounds that Inc. persisted in doing what it had been doing, with Matusa's approval, for some time.

The district court also recognized that termination of a franchise is a drastic remedy where neither party has caused irreparable harm:

When the franchise was given to Inc., it was a very substantial benefit.... This right should not be set aside lightly, and I think, that the agreement recognized it.... [O]n a simple mistake or misunderstanding a person doesn't lose a valuable property interest, which I believe this franchise is....

(R7–160 Ex. 1–8). The record supports the district court's finding that Inc. behaved as it did with the acquiescence and for the benefit of the plaintiff. Thus we affirm the ruling that the sub-franchise is still in existence and that it should be strictly enforced.

---

**9.** We also affirm the district court's denial of damages to either side. We agree with the court's holding that any award would be specu-

lative based on the lack of evidence of measurable damages. (R7–160 Ex. 1–17).

### D. Injunction Against Matusa

Finally, Matusa argues that the district court erred by entering judgment against a party not before the court. The sub-franchise granted to Inc. in 1967 covered all areas of the world except those specifically reserved to Limited. By default, this arrangement left all of Latin America except Cuba within Inc.'s franchise. However, the court found that Limited had invaded Inc.'s territory by entering into business in Central America "at a time when things were peaceful and that was agreed to." (R7–160 Ex. 1–20).

Because the contract must now be construed as an arms-length agreement, the court ruled that it would enforce the letter of the sub-franchise. Thus the court ruled that

> to the extent sales have been made in Costa Rica and Central America through Limited, they were acquiesced in, but in the future, they will have to stop distributing in that area and that area will be allocated to Inc. under its franchise agreement.

(R7–160 Ex. 1–20). The court also ruled that if Inc. wished to operate in Latin America, the plaintiffs would have to be reimbursed to the extent of their investment, including all developmental costs and good will. At a post-trial hearing on December 8, 1987, Matusa argued to the court that it was not the plaintiff Matusa, but rather Limited, a party not before the court, which was doing business in Latin America. Thus, Matusa claimed that the order was invalid. The court rejected the argument and ruled in its final order that the plaintiff, "its shareholders, directors, officers, employees, agents, licensees and sub-franchisees are ... perpetually enjoined from interfering with the rights of [Inc.]" in any of the geographic areas granted to it under the sub-franchise. (R7–160 2–3).

Rule 65 of the Federal Rules of Civil Procedure provides, in part:

> (d) Form and Scope of Injunction or Restraining Order.
>
> Every order granting an injunction and every restraining order ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons *in active concert or participation* with them who receive actual notice of the order by personal service or otherwise.

(emphasis added). The Supreme Court has held that "a nonparty with notice cannot be held in contempt until shown to be in concert or participation." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 112, 89 S.Ct. 1562, 1570, 23 L.Ed.2d 129 (1969). In that case the Court held that it was error to enter an injunction against Hazeltine, the corporate parent of HRI, the named counter-defendant, where Hazeltine was not a party to the suit and where the trial court made no finding that HRI and Hazeltine were one entity.

By the same analysis, the portion of the order in this case which enjoins Matusa from interfering with Inc.'s Latin American territory is binding only as to Matusa and those "in active concert or participation" with them. We express no opinion as to whether the order is therefore binding upon Limited, since the court made no factual finding on this question. The order states only that the injunction runs to the plaintiff and its "shareholders, directors, officers, employees, agents, *licensees and sub-franchises.*" We will leave to another day the delineation of the precise scope of the injunction. The district court has made a valiant effort to resolve both the legal questions presented and the intra-family squabbles. We assume all the individuals involved will attempt good faith compliance.[10]

AFFIRMED.

---

**10.** Hope springs eternal.