**In re Ron MATUSALEM & Matusa of Florida, Inc., Debtor.**

**Bankruptcy No. 92–16338–BKC–AJC.**

United States Bankruptcy Court, S.D. Florida.

Aug. 13, 1993.

---

Herbert Stettin, Rhea Grossman, Miami, FL, Gus Suarez, Coral Gables, FL, for Ron Matusalem, Inc.

Patricia A. Redmond, Stearns Weaver Miller, Weissler, Alhadeff & Sitterson, Harry A. Payton, Broad & Cassel, P.A., Miami, FL, for Debtor.

Gary Jones, c/o Hickey & Jones, Miami, FL, for Alexander H. Finance Co.

Office of the U.S. Trustee, Charles Glidewell, Asst. U.S. Trustee, Miami, FL.

### MEMORANDUM OPINION DENYING MOTION TO REJECT EXECUTORY CONTRACT

A. JAY CRISTOL, Bankruptcy Judge.

In 1872, the ancestors of the present litigants concocted a secret formula for the manufacture of rum. This was done on the island of Cuba which was at that time a Spanish possession. Debtors Exhibit No. 52 chronicles the events from 1872 to the present and includes business dealings, family feuds and litigation among three aristocratic families of old Cuba which have added to the clog of our judicial system for what seems like generations.

The history of this case evokes memories of Jarndyce and Jarndyce, described by Dickens in his famous novel, "Bleak House".

> Jarndyce and Jarndyce drones on. This scarecrow of a suit has, in course of time, become so complicated that no man alive knows what it means. The parties to it understand it least; but it has been observed that no two Chancery lawyers can talk about it for five minutes without coming to a total disagreement as to all the premises. Innumerable children have been born into the cause; innumerable young people have married into it; innumerable old people have died out of it. Scores of persons have deliriously found themselves made parties in Jarndyce and Jarndyce without knowing how or why; whole families have inherited legendary hatreds with the suit. There are not three Jarndyces left upon the earth perhaps, since old Tom Jarndyce in despair blew his brains out at a coffeehouse in Chancery Lane; but Jarndyce and Jarndyce still drags its dreary length before the Court, perennially hopeless.

> Bleak House, Charles Dickens, Ch. 1
> Page 3

The issue came before the court on the motion of the Debtor, Ron Matusalem & Matusa of Florida, Inc., (Matusa) hereinafter called "Debtor", seeking to reject an executory contract pursuant to 11 U.S.C. § 365. The contract is a sub-franchise agreement entered into in 1967 for a term of 50 years with an option carrying it out to 2067. Debtor is the owner of the intellectual property under franchise. Ron Matusalem, Inc., the respondent herein, hereinafter called ("Inc.") is the sub-franchisee.

The record is clear that this contract deals with intellectual property, a secret formula and a trademark. It is the opinion of the court that 11 U.S.C. § 365(n) is controlling. The dispute that will follow this opinion will undoubtedly focus on the interpretation and application of 11 U.S.C. § 365(n). The court is certain that the appellate process will further lengthen the shadow of this case to a degree that in the future, authors and jurists may refer to Ron Matusalem rather than Bleak House as the paradigm of never ending litigation.

Debtor argues that a rejection of the executory contract allows it to strip sub-franchisee of any continuing right to use the licensed intellectual property. *Lubri-*

zol Enterprises, Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043 (4th Cir. 1985) cert. denied 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); In re Chipwich, Inc., 54 B.R. 427 (S.D.N.Y.1985). Debtor argues that since the Bill which enacted the substance of 11 U.S.C. § 365(n) does not specifically address trademark, trade name or service mark issued, they are to be treated like ordinary 365 rejections and not in the special way provided for under § 365(n). Debtor relies on the Legislative history to support its position.

Inc. argues that the concurring opinion of Justice Scalia in Conroy v. Aniskoff, —— U.S. ——, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) holds Legislative history to be "a waste of research time and ink;" "and the only mode in which that will (the will of Congress) is spoken is in the act itself." Justice Scalia speaks for himself on this point and the dicta of the concurring opinion does not establish the law of the land.

### TO LOOK OR NOT TO LOOK

This court does not agree fully with either the Debtor or Inc. and is not persuaded by Justice Scalia's dicta at all. In many cases, a look at Legislative history is helpful in more fully understanding legislation. Such a look in this case does help decide the issue. The pertinent Legislative report states: "since these matters could not be addressed without more extensive study, it was determined to postpone Congressional action in this area and to allow the development of equitable treatment of this situation by Bankruptcy Courts." Thus, the ball is back in the Court's court. The court is impressed by the stated purpose of the Bill, the similarity of provisions of the Code as to the treatment of lessors and lessees and, in this situation, the plain language of § 365(n).

The case was tried by able counsel on both sides in a series of hearings held January 7, 1993; February 11, 1993; April 8, 1993 and July 1, 1993. The court heard testimony of more than a dozen witnesses, all but one called by Debtor. The court received into evidence, 53 initial exhibits from the Debtor, which were admitted without objection according to pre-trial order, and an additional four exhibits and a proffer from the Debtor which were not offered in accordance with the pre-trial order, and were admitted on July 1, 1993. Exhibits 1 and 2 of July 1, 1993 were admitted over the objection of Respondent. The court also received 7 exhibits (A through G) from Respondent which were admitted without objection in accordance with the pre-trial order.

The court perceived Debtor's position to be difficult and, therefore, was extremely lenient with Debtor on evidentiary rulings and permitted admission of many items of purported evidence, over objections as to relevancy, with the object of giving Debtor every chance to prove its case. To no avail. The Debtor's case fell far short of establishing a basis for authorizing rejection under § 365 and in fact tended to prove Inc.'s case.

### FINDINGS OF FACT

The Debtor is now in the position of franchisor and Inc., though its sub-franchise agreement, is in the position of franchisee under a 50 year exclusive franchise agreement signed in 1967 granting to Inc. the exclusive right to use certain secret processes and formulas for the manufacture of rum products, the exclusive right to use the name "Matusalem" and related names for the sale of those rum products, and the exclusive right to manufacture, distribute and sell those rum products in Puerto Rico, the United States of America and Central and South America. The agreement contains an option to extend the franchise for another 50 years. The Debtor retained the right to ensure quality control and to provide the secret formula, and had the obligation to continue registration of the trademark throughout the exclusive area. Inc. paid an initial fee and had the obligation to pay royalties during the life of the agreement. Until 1981, the three families controlling the Debtor, Inc. and another franchisee, Ron Matusalem, Ltd., apparently worked in harmony. Unfortunately, a falling out occurred and litigation

for litigation's sake has been a constant fact of life ever since.

It is appropriate to quote a portion of the opinion in *Ron Matusalem & Matusa of Florida, Inc. v. Ron Matusalem, Inc.*, 872 F.2d 1547, (11th Cir.1989) in order to re-state precisely facts established in prior litigation and to understand the history of this donnybrook.

FAY, Circuit Judge:

Plaintiff Ron Matusalem & Matusa of Florida, Inc. ("Matusa") appeals from a judgment of the United States District Court for the Southern District of Florida holding that the defendant Ron Matusalem, Inc. ("Inc.") had not breached its sub-franchise contract, and that the plaintiff's termination of the sub-franchise was invalid. The parties to the dispute are comprised essentially of two sides of a family descended from the family patriarch, who was the owner of a rum company in Cuba. Matusa and Inc., which are separate corporate entities, operated the rum company for many years as a family business. The business relationship was formalized by contract, but the companies interacted on an informal basis at times ignoring the strict wording of the contract where it suited their mutual interest. However, after an unfortunate falling out between the two sides of the family, described by the district court as a "family squabble," the business relationship became adversarial. Matusa, the owner of the company trademarks, demanded that Inc. comport to the letter of the written agreement. When Inc. refused to comply, Matusa sought to terminate Inc.'s sub-franchise. Matusa brought suit seeking injunctive relief and damages for trademark infringement under the Lanham Act, 15 U.S.C. § 1051 *et seq.* (1982), breach of contract, and other state law claims. The district court found that Inc.'s actions did not amount to a terminable breach and Matusa appealed. Because we believe that the record amply supports the findings of the district court, we affirm.

## I. OF VANILLA BEANS AND PRUNE MACERATIONS

In 1872, a Cuban business was established to manufacture a high quality rum under the name "Ron Matusalem." In 1944, Alvarez, Camp y Cia obtained a United States trademark registration for the trademark Matusa. In 1948, Ron Alvarez Camp, S.A. assignee of Alvarez, Camp y Cia obtained a registration for the trademark and corporate logo Matusa.

Prior to his death in 1955, Claudio Alvarez Lefebre, majority owner of Ron Alvarez Camp, wrote in a book his secret formulas for making rums sold under the trademark Ron Matusalem. Following his death, ownership of the business and the trade secrets passed to his wife and children. In the late 1950's and early 1960's the family members fled from Cuba to Miami, bringing the trade secrets with them.

In 1961, two corporations were created to carry on the family's rum making enterprise: Matusa, a Florida corporation, was incorporated on May 4, 1961; and Compania Licorera Oriente ("Licorera"), a Puerto Rican corporation, was incorporated on May 9, 1961. On May 16, 1961, Ron Alvarez Camp granted a franchise to Licorera, giving it essentially worldwide rights to make and sell Ron Matusalem rums under Ron Alvarez Camp's trademarks. The franchise provided that the nature and quality of the rums sold under the trademarks were subject to the control of Ron Alvarez Camp, and gave Ron Alvarez Camp the right to terminate the agreement upon the failure of Licorera to comply with its provisions.

On June 14, 1961, Ron Alvarez Camp assigned to Matusa all of its trademarks worldwide, its trademark registrations and good will, and all of its rights under the franchise agreement with Licorera. The effect of this assignment was to substitute Matusa for Ron Alvarez Camp as the trademark and trade secret owner for all legal purposes outside of Cuba. In 1964, Ron Matusalem, Limited ("Lim-

ited") was incorporated in the Bahamas, and on October 20, 1964, Licorera granted it an exclusive sub-franchise to manufacture and distribute Ron Matusalem rums in all countries of the world except Cuba. In the sub-franchise agreement, Matusa was given the rights to receive royalties, to control the quality of the rums produced by Limited, and to terminate the sub-franchise for specific breaches. Although Limited's territories were exclusive and worldwide (excepting only Cuba), Licorera reserved the right to grant similar sub-franchises in the future covering any country or territory except the British Isles, Europe, Canada, Bermuda and the Bahamas. If any such sub-franchise were granted, that franchised territory would be excluded thereafter from Limited's sub-franchise.

In 1967, Inc. was incorporated in Puerto Rico and Licorera granted it a sub-franchise covering all countries of the world, with the exception that Inc. could not use the trademarks in Cuba, the British Isles, Europe, Canada, Bermuda or the Bahamas without the permission of Limited. Under the terms of the sub-franchise, Inc. was to pay to Matusa royalties equaling ten percent of its annual net profit. As in the sub-franchise granted to Limited, Matusa was expressly given the right to terminate Inc.'s sub-franchise for specific breaches of its terms.[1]

In 1978, United Liquors Corporation ("United") was incorporated. United took over many billing and invoicing functions that Matusa had previously performed for Inc. in the United States.[2]

From the time of the incorporations of Matusa, Licorera, Limited, and Inc., until September, 1981, all the corporations were operated under the coordinated direction of three people; Gerardo Abascal, Sr., Gerardo Abascal, Jr., and Ricardo Abascal. Gerardo Sr. is the son-in-law of Claudio Alvarez Lefebre. Gerardo Jr. is his son and Ricardo is his brother. Between mid-June and late September, 1981, the Abascals were dismissed from their positions as principal officers of Matusa, Licorera and Limited. The Abascals retained control over Inc., while the plaintiff's side of the family controlled Matusa, Limited and Licorera.[3]

## II. THE PITS

Until the time of the falling out between the two sides of the family, Matusa, Inc., and the other companies were apparently run as one family business, described by the district court as a "loose knit strada of corporations." (R7–160 Ex. 1–4). However, beginning in late 1981, the loose knit strada fell apart at its corporate seams. The resulting factions, Inc. and United on the one hand and Matusa, Licorera and Limited on the other, ceased to deal with each other as family members with a common interest. On October 15, 1982 Matusa gave written notice to Inc. of a number of purported breaches of its obligations under the franchise agreement. The letter stated that if Inc. failed to rectify its noncompliance with the sub-franchise agreement within thirty days as provided for in the

---

1. In its oral findings of fact and conclusions of law, the district court noted that the Licorera corporation was "kind of an empty shell." (R7–160 Ex. 1–6). Although Licorera granted the sub-franchises to the companies which actually make and sell the product, Matusa was given the right under the sub-franchise agreements to receive royalties and the sole power to terminate the sub-franchises.

2. The court treated Inc. and United as a single party for purposes of this litigation.

3. The plaintiff's side of the family, which owns a 59 percent interest in Limited, is comprised of the descendants of Claudio Alvarez Lefebre through his daughter Dora. In June, 1981 Ricardo Abascal fired Dora's husband, Rolando Vazquez Milla, from his position as the supervisor of quality control for Matusa before the Abascals were dismissed as the principal officers of Matusa. These events resulted from the falling out between the two sides of the family. Rolando and Dora's children, Nela, Rocky and Manny comprise the side of the family which now controls Matusa.

contract, Matusa would terminate the sub-franchise.[4]

Matusa asserted several grounds for termination of the sub-franchise. First, Inc. began making its own substitute formula using commercially purchased extracts and concentrates in place of the prune and vanilla bean macerations which Matusa maintains are indispensable components of the secret formula required to make Matusalem rums. Second, the Abascals incorporated a Canadian corporation, "Ron Matusalem Canada, Ltd.," for the sale and distribution in Canada of a liqueur under the Matusalem trademark and logo.[5] Matusa claimed that the sales in Canada violated the sub-franchise agreement because Inc.'s franchise territory did not encompass Canada, and because Inc. was required to obtain Limited's permission to make such sales and to pay royalties to Matusa, both of which it failed to do. Third, Matusa claimed that Inc. effectively repudiated its franchise rights by filing a United States trademark application to register "Ron Matusalem," claiming that it was the owner of the trademark, and by refusing to assign or abandon its application to register Matusa's trademark once Matusa demanded that it do so.

On July 19, 1982 Matusa sent Inc. a letter stating that its sub-franchise was terminated for failure to cure the alleged breaches within the 30 day period. Thereafter, in an effort to cut off the defendants' business, Matusa notified United's suppliers that the sub-franchise had been terminated. Matusa filed suit on August 18, 1983 seeking to enjoin Inc. and United from making any further use of the Matusalem trademarks. Matusa also sought damages and an accounting for breach of contract trademark infringement, unfair competition, injury to business reputation and misappropriation of trade secrets. After an eight day bench trial, the district court issued oral findings of fact and conclusions of law. The court concluded that the plaintiff had failed to prove any violations by the defendants sufficient to warrant the termination of the sub-franchise. The court ruled that the franchise would be enforced, that Inc. was thus required to act in strict compliance with its terms, and that Inc.'s pending trademark applications must be transferred to Matusa. The court also ruled that sales made through Limited in Central America must stop because that territory belongs to Inc. under its sub-franchise. To the extent that money had been invested in the production and sale of Matusalem rums in Latin America by Matusa or one of its licensees, the court ruled that Inc. would have to reimburse the developer for these expenses. Matusa appeals, contending that the district court erred in finding that no terminable breach of the sub-franchise occurred. Matusa also claims that the court was without jurisdiction to order that all sales of Matusalem products by parties other than Inc. cease, because the enforcement of that order would affect parties not before the court. We now address each of these issues in turn.

### III. THE WRINKLES

#### A. Standard of Review

In examining the findings of the district court, we note the factual nature of the dispositive issues before us. A finding of fact by a trial court may not be reversed by an appellate court unless "clearly erroneous." Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518

---

4. The sub-franchise agreement between Licorera and Inc. provides, in part, as follows:

8. Upon failure of [Inc.] to comply with the provisions of ... this Sub–Franchise Agreement, ... Matusa, the owner of such trademarks, shall have the right to terminate this Sub–Franchise Agreement by giving 30 days written notice of its intention to terminate this Sub–Franchise Agreement; provid-

ed, that this Sub–Franchise Agreement shall not be terminated if within such 30–day period [Inc.] takes steps to rectify its non-compliance.

5. Following their receipt of Matusa's letter, the Abascals changed the name of the Canadian corporation to "Roncoco Canada, Ltd."

(1985). In this case the court was asked to determine whether the evidence presented to it established a breach by the defendant of its sub-franchise contract.

The Supreme Court has held that Rule 52(a) "does not divide facts into categories; in particular, it does not divide findings of fact into those that deal with 'ultimate' and those that deal with 'subsidiary' facts." *Pullman–Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). We have held that a district court's "application of the legal standard ... to the facts of the case ... is reviewed under the 'clearly erroneous standard.' " *Daley v. United States*, 792 F.2d 1081, 1086 (11th Cir. 1986) (quoting *Miller v. United States*, 587 F.2d 991, 994 (9th Cir.1978)). The question of whether a contract has been breached is such an issue of ultimate fact, requiring the application of a legal standard to a given set of facts. See *Cabriolet Porsche Audi, Inc. v. American Honda Motor Co.*, 773 F.2d 1193 (11th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986). Thus we apply the clearly erroneous standard to the district court's finding that the sub-franchise was not breached.

Debtor's pre-bankruptcy attempts to terminate Inc.'s franchise agreement in the District Court and in the Eleventh Circuit failed entirely. (Also, efforts of Matusa in the Probate Division of the Dade County Circuit Court were not successful.)

Debtor has not been engaged in any active business operations involving the distillation, distribution or sale of rum products since 1981. In July 1992, it appears that the operations of the Debtor by the Vasquez family resulted in a serious decline of the business.

Dr. Claudio Alvarez, a bright and personable doctor of medicine, gained voting control of the Debtor from the Vasquez family and caused the Debtor to file this Chapter 11 proceeding. The principal purpose of the Chapter 11 is to cause the rejection of Inc.'s franchise agreement. The court finds that this is not an effort at reorganization but a vendetta. A motion to reject the executory contract, pursuant to § 365(a), was filed on December 10, 1992 (C.P. No. 32).

The evidence offered in support of the motion to reject the Inc. franchise agreement was based upon a business plan prepared by Professor Steven Barsby, an economist and statistician whose expertise is in forecasting trends in the distilling industry. Though clearly an academic expert, Professor Barsby lives in the Ivory Tower of Academics, not the market place. Under the Barsby plan, the Debtor proposes to eliminate Inc. and assume the business operations of Inc. upon termination of Inc.'s franchise agreement. Debtor then proposes to reposition the Matusalem brand of rum by raising the price and using the anticipated extra income to advertise in order to offset the resultant drop in sales which Professor Barsby concedes will follow from raising the price. Professor Barsby concluded that Debtor could recapture lost sales within a period of several years and, thereafter, could make money. The professor did not explain the benefit of the destruction of profitability now in order to return to profitability in a number of years. Funding during the period of loss, would of necessity have to come from capital infusions.

Inc. presented the testimony of Kenneth Pincourt in opposition to this plan. Pincourt is the chief executive of a large public company in the business of producing and distributing distilled spirits. Pincourt described the Barsby plan as unrealistic and unworkable. He noted that the operating expense estimates were unrealistically low. He testified that a price increase would destroy the marketability of the product which probably would not be recaptured by advertising. He also testified that in his opinion, no distributor would handle the brand if rejection of the franchise and the existing distribution contract between Inc. and David Sherman, Inc. were to occur.

Debtor offered the testimony of Gary Jones, attorney for Hamilton Bank, who testified that the bank did not see the Debt-

or as a viable business without inclusion of the exclusive franchisee rights held by Inc.

Morton Cooper testified for debtor, in favor of rejection. He was discredited on cross-examination it having been shown that he has a financial interest in the outcome of the case.

Rolando Vasquez Alvarez testified at length for the debtor. He was not credible and not qualified to testify as an expert on the interpretation of the opinion of Judge Ryskamp in the U.S. District Court. Some of his testimony was in conflict with Debtor's own expert, Professor Barsby. He made numerous wild charges and statements, some of which were incredible. He added nothing relevant or material. On cross-examination, his charges of theft and misappropriation were shown to be without merit and without *any* evidentiary support. Debtor hurt its own case with the testimony of Rolando Vasquez Alvarez.

Debtor also offered the testimony of three grand elegant aristocrats, Señora Carmen Suarez Sanchez, Señora Luisa Alvarez and Señor Rolando Vasquez Nina who testified in Spanish about historical facts. They were all charming, candid, forthright and totally credible, but their testimony was not relevant to the issues before the court.

Dr. Claudio Alvarez, Debtor's chief executive and primary witness told Debtor's story and claimed to be without hard feelings towards his relatives on the other side. He acknowledged that the Debtor has not been actively engaged in the business of distilling, distributing or selling rum products for many years. He admitted that the Debtor has no employees, no machinery or equipment, no production facilities or warehouses, *no tangible assets* and no inventory. Dr. Alvarez admitted he has no experience in the rum or distilled spirits business and no evidence of competent, experienced management was presented.

Dr. Alvarez testified that he is involved in managed health care and, according to his testimony, is financially successful in this endeavor. The good doctor makes a classic error that the court sees day after day in bankruptcy court—he believes that a plan for one business is the same for all businesses. Testifying on April 8, 1993, his exact words on this query were, "They are all the same." This is not so. This court has looked on with sympathy, time after time, when debtors who made it in one business came before the court with the remains of a new and different business. The planning and operation of businesses are not all the same. Ask Mr. Jack Penrod who successfully operated over a dozen McDonald restaurants as a franchisee but whose company, WUV's, became extinct in so closely related a business as WUV's, a hamburger franchisor. Even the other side of the hamburger is not the same. The court has seen a husband and wife in their late sixties, who made substantial money in dry cleaning in New Jersey and thought "it was all the same," when they went into gold mining in Arizona. Gold mining in Arizona cleaned them of every penny. A successful radio station operator found that leasing jet aircraft is not the same. It cost him his fortune as well as his life. A very fine doctor learned that the operation of a restaurant was not the same as the practice of pediatric medicine. And so it goes. The Debtor is seeking to begin a new speculative business venture by destroying its franchisee, Inc. and then operating a rum distillation and distribution company in the same manner as a managed health care business. The court is persuaded that this is not good business judgment.

## CONCLUSIONS OF LAW

■ Section 365(n) provides that if an executory contract under which the debtor is a licensor of intellectual property is rejected, the licensee may retain its rights as they existed before the case began. In other words, rejection will not terminate the rights of a franchisee to use intellectual property or retain its exclusive rights under the franchise if the franchisee elects to retain the rights under § 365(n)(1)(B). Section 101(56) defines intellectual property to include trade secrets, process, design and work of authorship as defined by Title 17 of the United States Code. Section 102(a) of Title 17 defines "work of authorship" to

include pictorial, graphic and sculptural works. Even if rejection were permitted, it would not automatically result in the termination of Inc.'s exclusive rights within its territorial area to the secret process and formulas used to make rum products or Inc.'s exclusive rights to manufacture and sell these products within its territorial area. The Debtor could use the name outside the exclusive territory of Inc., which it can do now, but could not sell rum under the rum label made with the secret formula in Inc.'s exclusive territories. Thus, rejection under § 365(n) would not deprive Inc. of its rights under the franchise agreement. It would, however, make the Debtor potentially liable for a rejection claim.

■ The court determines that the Debtor has failed to demonstrate good business judgment or even mediocre business judgment. There is no economic benefit to the estate and its unsecured creditors from a rejection of Inc.'s franchise agreement either under the court's interpretation of § 365(n) or under the Debtor's interpretation of it. The court finds the testimony of Kenneth Pincourt to be reasonable and logical based on actual expertise, and far more persuasive than that of Professor Steven Barsby, whose assumptions are doubtful and whose conclusions are highly speculative and theoretical. Professor Barsby is well established as an expert in collecting data of past events for use in forecasting and predicting by business professionals but his track record in drawing conclusions and making assumptions from his collected historical data is unproven. For example, his projections of a continued increasing market share against Bacardi is more a wish than a potential reality when considered against the historical evidence in this case. The court concludes that the business plan proposed by the Debtor is based upon faulty levels of expenses and an unlikely premise that increases in pricing and advertising will overcome declines in sales. The court is satisfied that the Debtor's business plan is not feasible. The Debtor has also taken the position that the secret formula is the key to the product's success, and that if the taste changes, sales would suffer. Historical evidence suggests that

the taste issue is not a factor. The court concludes that there would be no economic advantage to the Debtor from rejection. There is no realistic expectation that the debtor can propose and carry out a viable plan of reorganization based on Barsby's improbable business plan.

The court also concludes that if the Debtor's conception of § 365(n) were implemented, the proposed rejection would utterly destroy the business of Inc. and with it the livelihood of Inc.'s principals and employees. Such an act of destruction would be without any realistic expectation of success by the Debtor in its new proposed business venture. Rejection, as contemplated by the Debtor, would lead to the filing of a large damage claim pursuant to Section 365(g) and a new round of litigation over the amount of the claim, with the probable result that the Debtor would be unable to pay the claim.

Rejection should also be denied because the evidence demonstrates that this case was probably filed in bad faith for the principal purpose of taking another bite at an apple that has already been eaten and digested in the United States District Court for the Southern District of Florida, the United States Court of Appeals for the Eleventh Circuit and, the Probate Division of the Circuit Court for Dade County, Florida. It is ineluctably clear that in seeking rejection, the Debtor hopes to accomplish under the Bankruptcy Code what the District Court, Court of Appeals and the State Court would not permit. The Code was not enacted for this purpose. It is clear that rejection as proposed and contemplated by the Debtor would eviscerate Inc. It is even more clear that neither the Debtor nor the unsecured creditors would benefit by rejection.

Finally, the court notes that rejection is inappropriate because the Debtor has no existing business to reorganize. This case is not about restructuring an ongoing business operation or salvaging existing jobs. It is an effort by the franchisor (1) to obtain vengeance (2) to create a new business on the ashes of the franchisee and (3)

to take a Guinness Book of Records title away from Jarndyce and Jarndyce. The first two efforts will not be permitted. The latter effort appears to be a complete success.

The motion for rejection is denied.

**DONE and ORDERED.**