AMBRO, Circuit Judge,
concurring
I join Judge Roth’s opinion in full, and write separately to address the Bankruptcy Court’s determination, adopted by the District Court, that “[Rejection of the *965 Agreement leaves EnerSys without the right to use the Exide mark.” In re Exide Techs., 340 B.R. 222, 250 (Bankr.Del.2006). I disagree with that determination, as I believe a trademark licensor’s rejection of a trademark agreement under 11 U.S.C. § 365 does not necessarily deprive the trademark licensee of its rights in the licensed mark.
In Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043 (4th Cir.1985), cert. denied, 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986), a licensor, Richmond Metal Finishers, granted a nonexclusive technology license to Lubrizol. The license stated that Richmond and Lubrizol owed each other certain duties. See id. at 1045. Shortly thereafter, Richmond filed for bankruptcy protection and sought to rescind the license by rejecting it under § 365. The Fourth Circuit Court granted this request and “deprive[d] Lubrizol of all rights” under the license:
Under 11 U.S.C. § 365(g), Lubrizol would be entitled to treat rejection as a breach and seek a money damages remedy; however, it could not seek to retain its contract rights in the technology by specific performance even if that remedy would ordinarily be available upon breach of this type of contract.
Id. at 1048. The Court acknowledged that this interpretation of rejection as a termination “could have a general chilling effect upon the willingness of ... parties to contract at all with businesses in possible financial difficulty.” Id. “But,” it said, “under bankruptcy law such equitable considerations may not be indulged by courts in respect of the type of contract here in issue.” Id.
Reacting to industry concerns that “after Lubrizol any patent or trademark li-censor could go into Chapter 11 and invalidate a license perfectly valid under contract law,” Congress enacted 11 U.S.C. § 365(n). Jay Lawrence Westbrook, A Functional Analysis of Executory Contracts, 74 Minn. L.Rev. 227, 307 (1989). Through this provision, Congress sought “to make clear that the rights of an intellectual property licensee to use the licensed property cannot be unilaterally cut off as a result of the rejection of the license pursuant to Section 365 in the event of the licensor’s bankruptcy.” S.Rep. No. 100-505, at 1 (1988), reprinted in 1988 U.S.C.C.A.N. 3200, 3200.
Section 365(n) reads in relevant part:
If the trustee rejects an executory contract under which the debtor is a li-censor of a right to intellectual property, the licensee under such contract may elect—
(A) to treat such contract as terminated by such rejection if such rejection by the trustee amounts to such a breach as would entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or
(B) to retain its rights (including the right to enforce any exclusivity provision of such contract, but excluding any other right under applicable non-bankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property ..., as such rights existed immediately before the case commenced for—
(i) the duration of such contract; and
(ii) any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.
*966 11 U.S.C. 365(n)(l). Thus, in the event that a bankrupt licensor rejects an intellectual property license, § 365(n) allows a licensee to retain its licensed rights — along with its duties — absent any obligations owed by the debtor-licensor.
Congress, however, did not include trademarks within the relevant definition of “intellectual property.” Instead, it defined “intellectual property” only to include a:
(A) trade secret;
(B) invention, process, design, or plant protected under title 35;
(C) patent application;
(D) plant variety;
(E) work of authorship protected under title 17; or
(F) mask work protected under chapter 9 of title 17;
to the extent protected by applicable nonbankruptcy law.
11 U.S.C. § 101(35A).
Because Congress did not protect trademark licensees under § 365(n), courts have reasoned by negative inference that it intended for Lubrizol’s holding to control when a bankrupt licensor rejects a trademark license. See, e.g., In re Old Carco LLC, 406 B.R. 180, 211 (Bankr.S.D.N.Y.2009) (“Trademarks are not ‘intellectual property’ under the Bankruptcy Code ... [, so] rejection of licenses by [a] licensor deprives [the] licensee of [the] right to use [a] trademark....”); In re HQ Global Holdings, Inc., 290 B.R. 507, 513 (Bankr.D.Del.2003) (“[S]ince the Bankruptcy Code does not include trademarks in its protected class of intellectual property, Lubrizol controls and the Franchisees’ right to use the trademark stops on rejection.”); In re Centura Software Corp., 281 B.R. 660, 674-75 (Bankr.N.D.Cal.2002) (“Because Section 365(n) plainly excludes trademarks, the court holds that [the licensee] is not entitled to retain any rights in [the licensed trademark] under the rejected ... [trademark Agreement.”); In re Chipwich, Inc., 54 B.R. 427, 431 (Bankr.S.D.N.Y.1985) (“[B]y rejecting the [trademark] licenses[,] the debtor will deprive [the licensee] of its right to use the ... trademark for its products.”).
The Bankruptcy Court here adopted this reasoning:
Congress certainly could have included trademarks within the scope of § 365(n) [,] but saw fit not to protect them. Therefore, the holding in [Lubrizol v.] Richmond Metal Finishers, as well as the holdings in the other pre and post § 365(n) trademark rejection cases ..., still retain vitality insofar as they relate to trademark licenses. As a result, a trademark license is terminated upon rejection and the licensee is left only with a claim for damages.
In re Exide, 340 B.R. at 250 n. 40.
But while the Supreme Court has endorsed reasoning from negative inference in the context of § 365, see NLRB v. Bildisco & Bildisco, 465 U.S. 513, 522-23, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (holding that § 365(a) applied to collective-bargaining agreements covered by the National Labor Relations Act because Congress failed to draft an exclusion for them), I believe such reasoning is inapt for trademark license rejections.
When Congress enacted § 365(n), it explicitly explained why it excluded trademark licensees from the protection afforded to “intellectual property” licensees:
[T]he bill does not address the rejection of executory trademark, trade name or service mark licenses by debtor-li-censors. While such rejection is of concern because of the interpretation of section 365 by the Lubrizol court and others, see, e.g., In re Chipwich, Inc., 54 *967 Bankr.Rep. 427 (Bankr.S.D.N.Y.1985), such contracts raise issues beyond the scope of this legislation. In particular, trademark, trade name and service mark licensing relationships depend to a large extent on control of the quality of the products or services sold by the licensee. Since these matters could not be addressed without more extensive study, it was determined to postpone congressional action in this area and to allow the development of equitable treatment of this situation by bankruptcy courts.
S.Rep. No. 100-505, at 5, reprinted in 1988 U.S.C.C.A.N. at 3204. “Nor does the bill address or intend any inference to be drawn concerning the treatment of execu-tory contracts which are unrelated to intellectual property.” Id.[1]
In light of these direct congressional statements of intent, it is “simply more freight than negative inference will bear” to read rejection of a trademark license to effect the same result as termination of that license. Michael T. Andrew, Executo-ry Contracts Revisited, 62 U. Colo. L.Rev. 1, 11 (1991). “[T]he purpose of § 365” is not “to be the functional equivalent of a rescission, rendering void the contract and requiring that the parties be put back in the positions they occupied before the contract was formed.” Thompkins v. Lil’ Joe Records, Inc., 476 F.3d 1294, 1306 (11th Cir.2007). It “merely frees the estate from the obligation to perform,” and “has absolutely no effect upon the contract’s continued existence.” Id. (internal citations omitted); see also 3 Collier on Bankruptcy ¶ 365.14 n. 3 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.2009) (noting some take the view that “rejection by the debtor terminates the rights of the other parties to the contract as opposed to being simply a determination not to perform, more in the nature of an abandonment, which was the intellectual source of the rejection concept”); 2 Norton Bankruptcy Law and Practice § 46:57 (3d ed. 2008) (“The Bankruptcy Code instructs us that rejection is a breach of the executory contract. It is not avoidance, rescission, or termination.” (footnotes omitted)).
By permitting Exide to “extinguish [ ]” EnerSys’s right in the “Exide” mark through § 365 rejection, the Bankruptcy and District Courts failed to follow this path. Rather than reasoning from negative inference to apply another Circuit’s holding to this dispute, the Courts here should have used, I believe, their equitable powers to give Exide a fresh start without stripping EnerSys of its fairly procured trademark rights. Cf. In re Matusalem, 158 B.R. 514, 521-22 (Bankr.S.D.Fla.1993) (suggesting that rejection of a trademark license would not deprive a licensee of its rights in the licensed mark).
Courts may use § 365 to free a bankrupt trademark licensor from burdensome duties that hinder its reorganization. They should not — as occurred in this case — use it to let a licensor take back trademark rights it bargained away. This makes bankruptcy more a sword than a *968 shield, putting debtor-licensors m a catbird seat they often do not deserve.

. This statement may stem from the recommendation of the National Bankruptcy Conference that “there should be in this legislative history a caveat that makes it clear that no negative inferences are to be drawn or should be drawn by courts that, because Congress has legislated in a particular way a licensing agreement, those other agreements that are not within the parameters of the legislation are lo be dealt with in any particular way.” Intellectual Property Contracts in Bankmptcy: Hearing on H.R. 4657 Before the Subcomm. on Monopolies and Commercial Law of the H. Comm, on the Judiciary, 100th Cong. 101 (1988) (statement of George Hahn, Esq., Representative, National Bankruptcy Conference).