**C.A.R. TRANSPORTATION BROKERAGE COMPANY, INC., Plaintiff–Appellant,**

v.

**DARDEN RESTAURANTS, INC.; Gulf, Atlantic & Pacific Shipper Services, Inc.; Trans–Pac Foods, Ltd., Defendants–Appellees.**

No. 98–56122.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 7, 2000

Filed May 22, 2000

William J. Sarrus, Tustin, California; and Joseph T. Bambrick, Jr., Joseph T. Bambrick & Associates, West Reading, Pennsylvania, for the plaintiff-appellant.

Lisa Ann Cohen, Frank E. Merideth, Jr., and Edward Gerard Becker, Dawn Bittleston, Bryan Cave, Santa Monica, California, for the defendants-appellees.

Before: PREGERSON, MAGILL,* and THOMAS, Circuit Judges.

MAGILL, Senior Circuit Judge:

This case arises out of a dispute concerning the payment of $5,750.00 in freight charges incurred when Trans–Pac Foods, Ltd. (Trans–Pac) arranged to send three truckloads of shrimp to Darden Restaurants, Inc. (Darden). The plaintiff in this case, C.A.R. Transportation Brokerage Company, Inc. (CAR), filed suit against Darden and Trans–Pac claiming that, under 49 U.S.C. § 13706, Darden and/or Trans–Pac (collectively, Appellees) must pay it for the freight charges generated by the three shipments. CAR appeals the district court's grant of summary judgment holding that "Waiver of Claim by Subcontractor" forms signed by truck drivers for the carriers of the shrimp shipments lawfully allocated liability for the freight charges under the Interstate Commerce Act (ICA). CAR also appeals the court's holding that the drivers had ostensible authority to sign the waivers on behalf of their principals. We affirm the judgment of the district court.

## I. BACKGROUND

In January 1997, Darden purchased frozen shrimp from Trans–Pac in Los Angeles for delivery to Darden's warehouse in Indianapolis, Indiana. Darden's purchase price for the shrimp included freight charges from Trans–Pac's facilities in Los Angeles to Indianapolis. Trans–Pac arranged for the transportation of the shrimp, apparently no small matter, through Gulf Atlantic & Pacific Shipper (GAP), a transportation broker.[1] GAP, in turn, contracted with CAR, also a transportation broker, and CAR arranged to have three different motor carriers transport the shrimp to Indiana.

The three shrimp shipments were tendered to Potts Transport, All American Transport, and Don Senske Trucking, Inc. (collectively, Carriers) at Trans–Pac's facilities on January 3, January 27, and January 28, 1997, respectively. The invoices and bills of lading for all three shipments designated Trans–Pac as the shipper/consignor and Darden as the consignee. The drivers, as "Authorized Representatives" for the Carriers, each signed a "Waiver of Claim by Subcontractor," waiving any claim the Carriers had against Appellees for the payment of shipping charges.[2] In

---

* Honorable Frank Magill, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

1. A "broker" is a person "other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2).

2. Each "Waiver of Claim by Subcontractor" reads:

> The undersigned motor carrier acknowledges and agrees that:
> 1. It is providing contract carriage services to [Trans–Pac] and/or [Trans–Pac's] customer as a subcontractor for another motor carrier or broker;
> 2. [Trans–Pac] and [Trans Pac's] customer have made no agreement, express or implied, to pay the undersigned for such services;

addition, Trans–Pac initialed a non-recourse clause on the bill of lading for the shipment delivered by Don Senske Trucking, Inc., releasing itself from any liability for the freight charges associated with the shipment.

The shipments were transported with reasonable dispatch and delivered in good order. On February 27, 1997, Trans–Pac paid GAP for the shipping charges. CAR billed GAP for the freight charges, but GAP never paid and on July 28, 1997, filed a Chapter 11 bankruptcy proceeding.

On May 20, 1997, CAR filed a lawsuit against Darden alleging that Darden, as consignee, was liable for the freight charges under 49 U.S.C. § 13706.[3] In response to concerns that it did not have standing to bring suit because it had no contractual relationship with either defendant, did not transport the shrimp itself, and did not establish that it is a "carrier" within the meaning of the ICA, CAR amended its complaint and, eventually, alleged that it had an assignment of rights from the Carriers. CAR also named Trans–Pac as a defendant. However, after CAR was unable to show that it had an assignment of rights from Potts Transport, it dropped its claim against Appellees for

the freight charges associated with that shipment. CAR also acknowledged that it had signed a nonrecourse provision on the bill of lading for the shipment transported by Don Senske Trucking, Inc. and withdrew its claim against Trans–Pac for the Senske shipment.

On April 17, 1998, Appellees moved for summary judgment on the only claims left: the All American Transport shipment for $1,925.00 against both Trans–Pac and Darden, and the Don Senske Truck, Inc. shipment for $1,925.00 against Darden. On May 20, 1998, after reviewing the evidence and arguments of the parties, the district court held that the waivers signed by the Carriers' drivers could lawfully allocate liability for freight charges under the ICA and that the drivers had ostensible authority to sign the waivers on behalf of their principals. Subsequently, CAR brought the present appeal.

## II. ANALYSIS

### A. Jurisdiction

The ICA requires motor common carriers to publish their rates in tariffs filed with the Surface Transportation

---

3. The Undersigned will not seek payment from [Trans–Pac] or [Trans–Pac's] customer for such services; and
4. To the extent the Undersigned is determined to have any legal right to such payment from [Trans–Pac] or [Trans–Pac's] customer, the Undersigned hereby waives such claim.

3. Section 13706 states:
(a) Liability of consignee.—Liability for payment of rates for transportation for a shipment of property by a shipper or consignor to a consignee other than the shipper or consignor, is determined under this section when the transportation is provided by motor carrier under this part. When the shipper or consignor instructs the carrier transporting the property to deliver it to a consignee that is an agent only, not having beneficial title to the property, the consignee is liable for rates billed at the time of delivery for which the consignee is otherwise liable, but not for additional rates that may be found to be due after delivery if the

consignee gives written notice to the delivering carrier before delivery of the property....
(b) Liability of beneficial owner.—When the consignee is liable only for rates billed at the time of delivery under subsection (a), the shipper or consignor, or, if the property is reconsigned or diverted, the beneficial owner is liable for those additional rates regardless of the bill of lading or contract under which the property was transported. The beneficial owner is liable for all rates when the property is reconsigned or diverted by an agent but is refused or abandoned at its ultimate destination if the agent gave the carrier in the reconsignment or diversion order a notice of agency and the name and address of the beneficial owner. A consignee giving the carrier erroneous information about the identity of the beneficial owner of the property is liable for the additional rates.

Board (Board),[4] and carriers are prohibited from charging or receiving a different compensation for the transportation than the rate specified in the tariff. 49 U.S.C. § 13702. The ICA "requires carrier to collect and consignee to pay all lawful charges duly prescribed by the tariff in respect of every shipment. Their duty and obligation grow out of and depend upon that act." *Louisville & Nashville R.R. v. Rice*, 247 U.S. 201, 202, 38 S.Ct. 429, 62 L.Ed. 1071 (1918). The historical purpose of the ICA was "to achieve uniformity in freight transportation charges, and thereby to eliminate the discrimination and favoritism that had plagued the railroad industry in the late 19th century." *Southern Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 344, 102 S.Ct. 1815, 72 L.Ed.2d 114 (1982) (citations omitted). Although there is no charge of discrimination or favoritism in this case, there is federal jurisdiction because any action between carriers and shippers arising from the filed rate presents a federal question supporting jurisdiction under 28 U.S.C. § 1337. *See Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983).

### B. Validity of the Waivers in Allocating Liability for the Freight Charges

CAR argues that the district court erred in granting summary judgment and holding that the ICA does not bar the parties' allocation of liability for the freight charges through use of the waivers and that the Carriers' drivers had ostensible authority to sign the waivers. In CAR's view, the provisions of the bills of lading used for the transportation of the shrimp either confer absolute liability on Appellees for the freight charges or are in conflict with the provisions of the waivers, thus producing ambiguity in the contract for transportation that should be interpreted in favor of CAR as the nondrafting party. CAR also argues that the drivers did not have ostensible authority to sign the waivers because the Carriers did not know about the waivers and did not explicitly make representations to Appellees concerning the scope of the drivers' authority. The district court's grant of summary judgment is reviewed de novo. *See Sameena Inc. v. United States Air Force*, 147 F.3d 1148, 1151 (9th Cir.1998).

### 1. Bill of Lading Issue

The Board requires the issuance of a receipt or bill of lading containing certain information for all interstate or foreign shipments by motor carrier. *See* 49 C.F.R. § 373.101. Although motor carriers are not required to use the Uniform Straight Bill of Lading prescribed for rail and water common carriers, *see* 49 C.F.R. § 1035.1(a), the parties here have adapted it for their purposes, *see* 49 C.F.R. § 1035 apps. A & B. "The bill of lading is the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers." *See Southern Pac.*, 456 U.S. at 342, 102 S.Ct. 1815 (citation omitted).[5] The bill of lading provides that the owner or consignee shall pay the freight and all other lawful charges upon the transported property and that the consignor remains liable to the carrier for all lawful charges.[6] *See Illinois Steel Co. v.*

---

4. The ICC Termination Act of 1995, Pub. L.No. 104–88, 109 Stat. 803 (1995), transferred the motor carrier regulatory functions of the Interstate Commerce Commission to the Department of Transportation and the Surface Transportation Board. *See* 49 U.S.C. § 13501.

5. A bill of lading serves three distinct functions: "First a receipt for the goods; second, a contract for their carriage; and, third, documentary evidence of title to the goods." *In re Chateaugay Corp.*, 78 B.R. 713, 717 (Bankr. S.D.N.Y.1987) (citation omitted).

6. Section 7 of the bill of lading provides in pertinent part: "The owner or consignee shall pay the freight and average, if any, and all other lawful charges accruing on said property according to lawfully filed tariffs of the carrier.... The consignor shall be liable for the freight and all other lawful charges...."

*Baltimore & Ohio R.R.,* 320 U.S. 508, 512–13, 64 S.Ct. 322, 88 L.Ed. 259 (1944). The bill of lading, however, also contains "nonrecourse" and "prepaid" provisions that, if marked by the parties, release the consignor and consignee from liability for the freight charges. If the nonrecourse clause is signed by the consignor and no provision is made for the payment of freight, delivery of the shipment to the consignee relieves the consignor of liability. *See id.* at 513, 64 S.Ct. 322. Similarly, when the prepaid provision on the bill of lading has been marked and the consignee has already paid its bill to the consignor, the consignee is not liable to the carrier for payment of the freight charges. *See Missouri Pac. R.R. Co. v. National Milling Co.,* 409 F.2d 882, 883–84 (3d Cir.1969); *In re Penn–Dixie Steel Corp.,* 6 B.R. 817, 822 (Bankr.S.D.N.Y.1980), *aff'd* 10 B.R. 878 (S.D.N.Y.1981).

■ Although the bill of lading contains default terms allocating liability for freight charges, the Supreme Court's description of the bill of lading as "the basic transportation contract between the shipper-consignor and the carrier," *Southern Pacific,* 456 U.S. at 342, 102 S.Ct. 1815, "did not purport to characterize the bill of lading as the exclusive means of creating a contract." *A–Transport Northwest Co. v. United States,* 36 F.3d 1576, 1583 (Fed.Cir. 1994). Subject to the rule that prohibits discrimination, the parties are free to contract when or by whom the freight charges should be paid. *See Louisville & Nashville R.R. v. Central Iron & Coal Co.,* 265 U.S. 59, 66, 44 S.Ct. 441, 68 L.Ed. 900 (1924); *Illinois Steel Co. v. Baltimore & Ohio R.R.,* 320 U.S. 508, 512, 64 S.Ct. 322, 88 L.Ed. 259 (1944). It is only where the parties fail to agree or where discriminatory practices are present that the ICA's default terms bind the parties. *See In re Roll Form Products, Inc.,* 662 F.2d 150,

154 (2d Cir.1981). In the face of other provisions, the liability allocation presumptions on the bill of lading are unnecessary. *See Fikse & Co. v. United States,* 23 Cl.Ct. 200, 204 (1991).

■ Clearly, the ICA's purpose of eliminating all forms of rate discrimination on interstate shipments is not implicated in this case. There is no allegation that the freight terms agreed to by the parties improperly deviate from filed common carrier tariffs or discriminate. Because an external contract, entered into by the Carriers, lawfully allocated liability for the freight charges, resort to the allocation presumptions on the bill of lading is unnecessary. The waivers signed by the drivers lawfully operated to waive the Carriers' rights against Appellees for the freight charges.

### 2. Authority of the Carriers' Drivers

■ California law controls the issue of whether the Carriers' drivers had ostensible authority[7] to sign the waivers. *See Mallott & Peterson v. Director, Office of Workers' Comp. Programs,* 98 F.3d 1170, 1173 n. 2 (9th Cir.1996). An agent acting within his apparent or ostensible authority binds the principal where the principal has intentionally or negligently allowed others to believe the agent has authority. *See Kaplan v. Coldwell Banker Residential Affiliates, Inc.,* 59 Cal.App.4th 741, 69 Cal. Rptr.2d 640, 642–43 (1997). Section 2317 of the Civil Code of California provides that "[o]stensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." Cal. Civ.Code § 2317.

■ An agent's authority may be implied from the circumstances of a particular case and may be proved by circumstan-

7. Contrary to CAR's claim that the district court erred in using the terms apparent authority and ostensible authority interchangeably, "[m]any courts use the terms ostensible agency, apparent agency, apparent authority, and agency by estoppel interchangeably. As a practical matter, there is no distinction among them." *Armato v. Baden,* 71 Cal. App.4th 885, 84 Cal.Rptr.2d 294, 301 n. 4 (1999) (citation omitted).

tial evidence. *Kelley v. R.F. Jones Co.,* 272 Cal.App.2d 113, 77 Cal.Rptr. 170, 174 (1969). However, unless only one conclusion may be drawn, existence of an agency and the extent of an agent's authority is a question of fact and should not be decided on summary judgment. *See American Cas. Co. v. Krieger,* 181 F.3d 1113, 1121 (9th Cir.1999).

 Contrary to CAR's claims, to establish ostensible authority, the principal's consent need not be express. *See Tomerlin v. Canadian Indem. Co.,* 61 Cal.2d 638, 39 Cal.Rptr. 731, 394 P.2d 571, 575 (1964). While it is true that the ostensible authority of an agent cannot be based solely upon the agent's conduct, *see Kaplan,* 59 Cal.App.4th at 747, 69 Cal.Rptr.2d at 643, it is not true that the principal must make explicit representations regarding the agent's authority to the third party before ostensible authority can be found. For example, ostensible authority may be proven through evidence of the principal transacting business solely through the agent, *see Kelley,* 77 Cal.Rptr. at 174, 272 Cal.App.2d at 120, the principal knowing that the agent holds himself out as clothed with certain authority but remaining silent, *see Krieger,* 181 F.3d at 1121, the principal's representations to the public in general, *see Kaplan,* 59 Cal.App.4th at 747, 69 Cal.Rptr.2d at 643, and the customs and usages of the particular trade in question, *see Correa v. Quality Motor Co.,* 118 Cal. App.2d 246, 257 P.2d 738, 741 (1953); *Auto Auction, Inc. v. Riding Motors,* 187 Cal. App.2d 693, 10 Cal.Rptr. 110, 113–14 (1960) (finding that a car salesman had ostensible authority to close an automobile sale based on the circumstances of the case "as well as in the light of the customs and usages of the particular trade of which we may take judicial notice").

 Appellees had the burden of proving the authority of the Carriers' drivers to sign the waivers. *See Inglewood Teachers Ass'n v. Public Employment Relations Bd.,* 227 Cal.App.3d 767, 278 Cal. Rptr. 228, 234 (1991)(stating that the burden "rests upon the party asserting the existence of the agency and seeking to charge the principal with the representation of the agent"). When the party moving for summary judgment would bear the burden of proof at trial, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Houghton v. South,* 965 F.2d 1532, 1536 (9th Cir.1992) (citation and quotations omitted). In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case. *See id.* at 1537. Once the moving party comes forward with sufficient evidence, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense." *Intel Corp. v. Hartford Accident & Indem. Co.,* 952 F.2d 1551, 1558 (9th Cir.1991) (citation omitted). "A motion for summary judgment may not be defeated, however, by evidence that is 'merely colorable' or 'is not significantly probative.'" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

 The district court found that the drivers had ostensible authority to sign the waivers based on the following factors: 1) the drivers executed all contractual documents on behalf of the Carriers governing the transport of the shrimp, including the bills of lading; 2) there is no evidence that anything placed Trans–Pac on notice that the drivers lacked authority to execute waivers for the Carriers; 3) the drivers were the only representatives of the Carriers with whom Trans–Pac dealt; 4) Trans–Pac did not even know the identity of the company that was going to haul a particular shipment until the driver arrived to transport it; and 5) the declaration of Frank DiGennaro, Trans–Pac's shipping manager, states that carriers' truck drivers routinely bind their principals to waiver agreements, agreements regarding liability for loss or damage to goods shipped, and other such provisions. In addition,

the waiver executed on behalf of Don Senske Trucking, Inc. was signed by Don Senske himself and the district court found that because the business bared his name, he was vested with apparent authority.

■ Clearly, Appellees came forward with sufficient evidence of ostensible authority to entitle them to a directed verdict if the evidence went uncontroverted at trial. To counter the evidence that Appellees produced, CAR merely offered the declaration of its General Manager, Clifford Riggins, who asserted that he has spent forty years in the trucking industry and is "not aware of any law that says a truck driver can bind his trucking company as to a waiver of its claims for transportation charges as a common carrier under federal law." The district court found that Riggins's declaration did not raise a question of fact concerning the drivers' apparent authority to waive the Carriers' claim for freight charges against Appellees. The district court reasoned that CAR failed to raise any material question of fact because the Riggins declaration addressed the issue of whether a specific law authorizes drivers to sign waivers on their carriers' behalf; an issue that is obviously irrelevant to whether industry custom and practice vests drivers with apparent authority to bind their carriers to terms in bills of lading and waivers of the right to collect freight charges from consignors and consignees.

We agree with the district court that CAR's supposed evidence refuting Appellees' showing of the drivers' ostensible authority did not set forth specific facts showing that there is a genuine issue for trial. Riggins's affidavit, the only evidence that CAR submitted, is simply not significantly probative evidence sufficient to defeat Appellees' motion for summary judgment.

## III. CONCLUSION

In sum, we affirm the district court's judgment that the parties lawfully allocated liability for the freight charges through the "Waiver of Subcontractor" forms and that the Carriers' drivers had ostensible authority to sign the waivers.