**In re CENTURA SOFTWARE CORPO- RATION, dba Mbrane, aka Mbrane Incorporated, Raima, Centura Solutions, Vista Development Corporation, Debtor.**

**Raima UK Limited, an English corporation, Plaintiff,**

**v.**

**Centura Software Corporation, dba Mbrane, aka Mbrane Incorporated, Raima, Centura Solutions, Vista Development Corporation, Defendant.**

**Bankruptcy No. 01–32164–DM. Adversary No. 01–3239.**

United States Bankruptcy Court, N.D. California.

July 24, 2002.

---

Dillon E. Jackson, Foster, Pepper & Shelfelman, PLLC, Seattle, WA, Douglas G. Boven, Crosby, Heafey, Roach & May P.C., San Francisco, CA, for Raima UK, Ltd.

Michael B. Schwarz, LeBoeuf, Lamb, Green & MacRae, L.L.P., San Francisco, CA, for The Official Committee of Unsecured Creditors.

David S. Caplan, Brooks & Raub, APC, Palo Alto, CA, for Centura Software Corp.

## MEMORANDUM DECISION ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT

DENNIS MONTALI, Bankruptcy Judge.

## I. INTRODUCTION

The court has been asked to decide what appears to be a question of first impression: following a debtor's rejection of a license agreement that grants a counter-party a license to use the debtor's software and trademarks, may the counter-party continue to use the trademarks after electing to retain its rights in the software? While the result may appear harsh to the counter-party, the court concludes that once a license has been rejected, the counter-party may not continue to use the trademarks.

Two motions have been filed in this adversary proceeding involving a dispute over rights asserted by Plaintiff Raima UK Limited ("Raima UK") to continue to market and sell software products under trademarks owned by Debtor/Defendant Centura Software Corporation ("Centura US"). Raima UK filed its motion for partial summary judgment ("Setoff Rights Motion"), requesting a determination that (1) its exercise of setoff rights was proper, (2) Centura US' termination of Raima UK's license agreement ("Raima UK Trademark Agreement") was therefore invalid and improper, and (3) Raima UK is entitled to the fees and costs it has incurred in obtaining the order invalidating the termination. Centura U.S. and the Committee of Unsecured Creditors ("Committee") filed their joint motion for partial summary judgment pursuant to 11 U.S.C. § 365(n)[1] ("365(n) Motion"). They re-

1. Unless otherwise indicated, all chapter, sec-      tion and rule references are to the Bankrupt-

quested a determination that, under § 365(n), Raima UK could not retain any trademark or obtain specific performance rights under the rejected Raima UK Trademark Agreement.

The matter came on for hearing on June 14, 2002. Dillon E. Jackson, Esq. appeared for Raima UK. David Caplan, Esq. and Michael B. Schwarz, Esq. appeared for Centura U.S. and Committee, respectively. For the reasons set forth below, the court will grant the 365(n) Motion and deny the Setoff Rights Motion.

## II. FACTS[2]

Raima UK was a wholly-owned English subsidiary of Raima Corporation ("Raima US"). Under the Raima UK Trademark Agreement, Raima U.S. granted Raima UK the exclusive right to market and sell its software ("Raima Software") under its trademarks ("Raima Trademarks") in the United Kingdom, Channel Islands, and the Republic of Ireland ("the UK market"). In return, during the term of the agreement, Raima UK was to pay a minimum of $100,000.00 in license fees for each fiscal year ending March 31. In December 1995, Raima UK was sold to a third party. Subsequently, in a reverse triangular merger in June 1999, Centura U.S. acquired all Raima US' rights, title, and interest in Raima Software and Raima Trademarks, including its rights under the Raima UK Trademark Agreement. Centura UK was, and still is, a wholly-owned subsidiary of Centura US.

On November 30, 2000, in order to exploit the UK market, Centura UK entered into an agreement ("Centura UK Agreement") with Raima UK. The Centura UK Agreement was a sublicense which provid-ed Centura UK the right to sell Raima Software under Raima Trademarks in the UK market. Centura UK was to pay Raima UK the license fees for its sales, and Raima UK would in turn pay Centura U.S. pursuant to the Raima UK Trademark Agreement. Section 10.5 of the Centura UK Agreement ("Section 10.5") also provided that, in the event that Centura UK delays or fails to pay Raima UK any fees resulting from its sale, Raima UK "will have the right to set off such delayed or unpaid amounts against any amounts payable by Raima UK to Centura [US] or Centura UK."

Raima UK asserts that, because of Centura UK's sale of Raima Software, Centura UK became obligated in December 2000 to pay Raima UK approximately $38,000.00 in license fees. When Centura UK failed to pay, Raima UK held back $20,000.00 from its First Quarter 2001 license fees payment due Centura US. After the setoff, it paid Centura U.S. approximately $82,000. Raima UK contends that by exercising its right of setoff, pursuant to Section 10.5 and making the payment, it satisfied its obligation to pay Centura U.S. the annual minimum license fee of $100,000.

In June 2001, Centura UK went into liquidation in England. Subsequently, in August 2001, Centura U.S. filed its Chapter 11 petition in this court. It then terminated the Raima UK Trademark Agreement on November 5, 2001, on the grounds that Raima UK had failed to pay the minimum license fees.

On November 18, 2001, this court issued a Stipulated Order Approving Rejection of License Agreements. The order provided for the rejection of the Raima UK Trademark Agreement, with Raima UK retaining any rights it may have under § 365(n).

cy Code, 11 U.S.C. §§ 101–1330 and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

**2.** The following discussion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr.P. 7052(a).

On November 21, 2001, Raima UK filed a complaint against Centura U.S. commencing this adversary proceeding. It alleged that it was not in breach of any obligation under the Raima UK Trademark Agreement and it was entitled to market and sell Raima Software under Raima Trademarks in the UK market. It also prayed for an order directing Centura U.S. or its predecessors to provide software updates and documentation. In addition, it requested attorney fees and costs incurred for filing the complaint. On January 17, 2002, Centura U.S. filed its answer and counterclaims. Its counterclaims included a request for the determination that Raima UK does not retain any rights to use the trademarks under the rejected Raima UK Trademark Agreement. After this court granted Committee's Stipulation to Intervene, Committee also filed similar counterclaims on May 10, 2002.

On March 29, 2002, Raima UK filed the Setoff Rights Motion, seeking partial summary judgment that the termination was invalid because the setoff of $20,000 was a proper exercise of its rights under Section 10.5. It requested a determination that, although Centura U.S. was not a signatory to the Centura UK Agreement, it was nonetheless bound by Section 10.5 (among other provisions) because Centura UK was its agent. Centura U.S. and the Committee denied any agency relationship and opposed this Setoff Rights Motion.

On May 17, 2002, Centura U.S. and Committee filed the 365(n) Motion, seeking partial summary judgment requesting the court to determine that § 365(n) does not protect Raima UK's rights to Raima Trademarks in the rejected agreement.

### III. DISCUSSION

#### A. *Setoff Rights Motion*

##### 1. *Burden of Proof*

Under Rule 7056, incorporating Federal Rules of Civil Procedure Rule 56, the moving party must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. *Houghton v. South*, 965 F.2d 1532, 1537 (9th Cir.1992). Once that burden is met, it shifts to the non-moving party, "who must present significant probative evidence tending to support its claim or defense." *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir.1991). Summary judgment should only be granted where the evidence shows "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

##### 2. *Whether Centura UK was Centura US' Agent Is a Question of Fact*

The first question is whether an agency relationship existed between Centura U.S. and Centura UK. If undisputed facts establish that one existed, then Centura U.S. was bound by the Centura UK Agreement and Section 10.5. The court would then determine if it was proper for Raima UK to have exercised its setoff rights against the minimum payment required by the Raima UK Trademark Agreement. If the court determines that the exercise was proper, it would grant the Setoff Rights Motion. However, if the facts fail to establish that Centura UK was an agent, the court will not be able to reach a conclusion as to whether Centura U.S. was indeed bound as a matter of law, and would therefore deny the motion. Because Section 16 of the Raima UK Trademark Agreement states that the agreement shall be governed and construed in all respects by English law, English law applies in the court's determination of the existence of agency.

Under English law, an agency relationship may be established in many

ways, including actual or apparent authority. 2 Chitty on Contracts ¶ 32–020.[3] One of the ways to establish actual authority is by presenting proof of express authorization by the principal. *Id.* ¶ 32–025. To establish ostensible agency, the party asserting the existence of the relationship must prove that the principal, (1) by its conduct, created an appearance of agency, (2) made a representation of such authority to a third party, and (3) caused him or her to rely on the appearance of agency.[4] Guenter Treitel, *The Law of Contract,* pp. 658–60 (10th ed.1999).

■ Raima UK alleged that Centura UK had express or ostensible authority to act on Centura US' behalf. Therefore, for its partial summary judgment motion to be granted, Raima UK must establish, without any genuine issue of material fact, one of the following: either Centura U.S. had expressly authorized Centura UK to be its agent, or Centura U.S. had, (1) by its conduct, created the appearance that it had authorized Centura UK to be its agent, (2) made a representation of such authority to Raima UK, and (3) caused Raima UK to rely on the appearance of agency. *See id.*

3. *Raima UK Did Not Carry Its Burden of Proof Under Its Actual Agency Theory Because Material Facts Regarding Centura US' Conduct Are In Dispute*

Whether Centura U.S. had expressly authorized Centura UK to be its agent is a disputed fact. It is also material because, had there been in fact an express authorization, Centura U.S. would be bound by the Centura UK Agreement. To make a prima facie showing that Centura U.S. had expressly authorized Centura UK to be its agent, Raima UK relied on the declaration of Mr. James Bush ("Bush"), a former Centura UK employee. In his declaration, Bush testified that he was expressly directed by Mr. John Bowman ("Bowman"), who was at the time both Chief Operating Officer of Centura U.S. and director of Centura UK, to represent both Centura UK and Centura U.S. in the negotiations with Mr. Don Wood ("Wood") of Raima UK. He testified that Bowman had asked him and Wood to formulate a proposal for the Centura UK Agreement. This evidence was corroborated by Wood's declaration. However, the existence of express authority was called into question by Bowman. In his declaration, Bowman testified that he did not give Bush any authority to act on behalf of Centura US. He declared that he did not suggest to anyone, including Wood, that Bush had the authority to bind Centura US. In addition, he stated that he had authorized Bush to negotiate the agreement only in his capacity as Director of Centura UK, not as Chief Operating Officer of Centura US.

Bowman's declaration was probative and supportive of Centura US' and Committee's defense that Centura U.S. had never expressly authorized Centura UK to be its

---

**3.** The relevant English substantive law on the creation of agency is similar to U.S. law. Under U.S. law, agency may be established by an express or implied agreement between the principal and the agent. Restatement (Second) of Agency § 1 (1958). It can also be established by apparent or ostensible authority. 3 Am.Jur.2d *Agency* § 342 (2002).

**4.** These elements constituting ostensible authority are again comparable to the elements in U.S. agency law. Under U.S. law, the party asserting the relationship must demonstrate that the principal, (1) by its conduct, created an appearance of agency, (2) caused him or her to reasonably believe that the putative agent is either an employee or an agent of the principal, and that (3) he or she thereby justifiably relied on the appearance of agency. 3 Am.Jur.2d *Agency* § 342.

agent in the negotiations. Viewing the evidence in a light most favorable to Centura US, the declaration has raised a factual dispute whose materiality precludes a determination that Centura U.S. had expressly authorized Centura UK to be its agent, thereby binding itself to the Centura UK Agreement. Accordingly, Raima UK's partial summary judgment motion based on an actual agency theory must be denied.

### 4. *Raima UK Did Not Carry Its Burden of Proof Under Its Ostensible Agency Theory Because Material Facts Regarding Centura US' Representation Are In Dispute*

As stated above, in order for its partial summary judgment motion based on ostensible authority to be granted, Raima UK must prove, with no material facts in dispute, that Centura U.S. had, (1) by its conduct, created the appearance that it had authorized Centura UK to be its agent, (2) made a representation of such authority to Raima UK, and (3) caused Raima UK to rely on the appearance of agency. *See id.* Here, facts regarding Centura US' conduct remain controverted.

■ To support elements (1) and (2), Raima UK relied on the Wood and Bush declarations. Wood testified that Bowman had told him that he was responsible for Centura US' relationship with Raima UK and that he would oversee all negotiations. Wood and Bush both testified that Bush needed Bowman's approval before signing the Centura UK Agreement and that the

roles of the Centura companies were blurred.[5] If Raima UK could establish without dispute that Bowman, in his capacity as an officer of Centura US, had delegated the actual negotiations to Bush and expressly represented to Wood that he was to oversee the process, Centura U.S. would have, by its conduct, represented to Raima UK that it was the principal behind the negotiations. Elements (1) and (2) would thus be satisfied. Likewise, if the roles of the companies were indeed obscure in every respect, those facts could reasonably establish that Centura U.S. had created the appearance that it had appointed Centura UK as its agent.[6] However, such facts are in dispute. As stated earlier, Bowman testified that he did not represent to Wood, Bush, or anyone that Bush had the authority to negotiate on Centura US' behalf. He also testified that the roles of Centura U.S. and Centura UK were distinct because they were two separate corporations, with Bush working only for the latter. He further stated that no representative of Centura US, in an official capacity, had reviewed the agreement prior to signing. Therefore, because the evidence brought forth by Raima UK is both material and disputed by Centura US, the court must also deny Raima UK's summary judgment motion based on the theory of ostensible authority. *See American Cas. Co. v. Krieger,* 181 F.3d 1113, 1121 (9th Cir.1999) (unless only one conclusion may be drawn, existence of an ostensible agency is a question of fact and should not be decided on summary judgment). *See also C.A.R. Transportation Brokerage Co.*

---

**5.** Wood's declaration stated that the roles of the Centura companies were blurred by Centura US' delegation to Centura UK the handling of license fee reports, sales reports, orders, and collections under the Raima UK Trademark Agreement. In addition, the two companies shared the same e-mail address, "@centurasoft.com."

**6.** Under the doctrine of ostensible authority, representation of authority can be express or implied. Treitel, *The Law of Contract,* pp. 658. It could be implied from a course of dealing or by placing the agent in such a position that it is reasonable for third parties to assume that the agent has the principal's authority. *Id.*

*v. Darden Restaurants, Inc.*, 213 F.3d 474, 479 (9th Cir.2000) (summary judgment is inappropriate in ostensible agency cases unless only one conclusion can be implied from the circumstances).

5. *If Centura U.S. was bound by the Centura UK Agreement, Raima UK Was Entitled to Set Off Centura UK's Unpaid License Fees Against the Minimum License Fees It Owed Centura US*

■ In their opposition to the motion, Centura U.S. and the Committee argued that, even if the Centura UK Agreement was binding on Centura US, and Raima UK did have the right to setoff, it did not have the right to set off against its $100,000.00 minimum license fee obligation to Centura US. They alleged that, because the setoff provision does not change the Raima UK Trademark Agreement's requirement of a minimum payment of $100,000.00, and Raima UK had only paid approximately $82,000.00, its termination of the agreement was therefore proper. The court disagrees. Because when interpreting a contract, "[t]he court will look first at the literal terms of the written document and determine what the terms mean from the ordinary language used,"[7] this court looks to the language of the setoff provision. Section 10.5 states:

> In the event that Centura UK delays or fails to make any of the payments due to Raima UK hereunder, Raima UK will have the right to set off such delayed or unpaid amounts against any amounts payable by Raima UK to Centura [US] or Centura UK from time to time including such amounts arising out of the UK

Rights Agreement [Raima UK Trademark Agreement].

The language of the provision is unambiguous. It allows Raima UK to setoff amounts owed by Centura UK against *any* amounts it owes to Centura US, including *any* amounts arising out of the Raima UK Trademark Agreement. The ordinary meaning of the word "any" therefore gives Raima UK the right to set off Centura UK's unpaid license fees against the license fees Raima UK owes to Centura US, regardless of what the amounts are.

In this motion, Wood's and Bush's testimony that Centura UK sold Raima Software in the UK market and had thus obligated itself to license fees due Raima UK is uncontroverted. However, whether Centura UK was in arrears under the Centura UK Agreement was in dispute. While Wood testified that Centura UK did not pay its fees, Bowman stated that none of the directors or officers of Centura U.S. has any knowledge of any non-payment by Centura UK. Therefore, although Raima UK may have had the right to set off, because whether Centura UK indeed owed money is in dispute, the court cannot determine whether Centura US' termination was proper at this time.

Assuming, however, that Centura U.S. was bound by Section 10.5 and that Centura UK did owe Raima UK license fees amounting to at least $18,000.00, Centura US' termination of the Raima UK Trademark Agreement would have been improper. This is because, in that case, not only had Raima UK properly exercised its setoff rights, it had also exercised them in a timely manner. Before the 2000–2001 license fees payment deadline (28 days after

**7.** Jason Chuah, *The Factual Matrix in the Construction of Commerical Contracts–The House of Lords Clarifies*, I.C.C.L.R., 12(12), 294, 295 (2001) (analyzing the principles of contract interpretation under English contract law, stating that courts should look to the natural reading of the contract and delve into facts regarding surrounding circumstances if the contract is ambiguous).

March 31, 2001), Raima UK paid Centura U.S. approximately $82,000.00 after a set-off of $20,000.00. Because these amounts together exceed the $100,000.00 minimum required by the Raima UK Trademark Agreement and because the payment was timely made, Raima UK's setoff did not breach the Raima UK Trademark Agreement's minimum license fee provision.

### B. *365(n) Motion*

■ Section 365 provides for the assumption or rejection of executory contracts or leases in existence at the commencement of a bankruptcy case. Lawrence P. King et al., *Collier on Bankruptcy* ¶ 365.01 pp. 365–17 (15th ed. Rev.2002). If the trustee or debtor-in-possession assumes a contract, it is not interrupted and the contracting parties' rights are undisturbed. *Id.* ¶ 365.03[2]. If, however, a contract is rejected, the debtor is deemed to have breached it, and the estate will lose any benefit from the contract. *Id.* The result for the counter-party is a prepetition claim under § 365(g). *Id.* Nevertheless, § 365 does not always leave the counter-party with only a breach claim. Hon. Joe Lee, 2B *Bankr.Service L.Ed.* § 21:2 (2002). Some provisions within § 365 permit certain contracting parties more rights than afforded by § 365(g).

*Id.* For example, § 365(h) protects a non-debtor lessee of a rejected real property lease or timeshare plan by providing the lessee the option to remain in possession. *Id.* § 365(i) deals with land and timeshare sale contracts, providing a non-debtor purchaser the opportunity to either terminate or remain in possession of the contract despite the rejection. *Id.* The provision at issue in this motion is § 365(n) which gives the rejection of intellectual property licenses special treatment. *Id.*

In October 1988, in reaction to the harsh holding of *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043 (4th Cir.1985), *cert. denied*, 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986),[8] Congress enacted the Intellectual Property Licenses in Bankruptcy Act (IPLBA) to protect licensees' rights to intellectual property in the event of a bankruptcy.[9] Pub.L. No. 100–506, 102 Stat. 2538 (1988). The critical provisions of IPLBA were codified as § 365(n) and § 101(35A), and their purpose is "to make clear that the rights of an intellectual property licensee to use the licensed property cannot be unilaterally cut off as a result of the rejection of the license." [10] S.Rep. No. 100–505, 100th Cong., 2d Sess.

---

**8.** The *Lubrizol* court allowed a Chapter 11 debtor to reject a non-exclusive technology license agreement, leaving the non-bankrupt party with only a money damage remedy, but no further rights under the agreement to use the technology. *Lubrizol* does not involve trademarks.

**9.** *See* Patrick Law, *Intellectual Property Licenses and Bankruptcy–Has the IPLBA Thawed the "Chilling Effects" of Lubrizol v. Richmond Metal Finishers?*, 99 Com. L.J. 261 (1994) ("Law, *IPLBA*") (IPLBA was enacted to reverse *Lubrizol's* chilling effect on the development and licensing of intellectual property).

**10.** *See* Robert T. Canavan, Comment, *Recent Trends in Bankruptcy Law*, 21 Seton Hall L.Rev. 800, 802–03 (Congress enacted IPLBA in order to prevent a technology licensor/debtor from unilaterally terminating intellectual property interests of the licensee). *See also* Law, *IPLBA*, at 264 (the purpose of § 365(n) is "to encourage investment in intellectual property and to protect the right of licensees who contribute financing, research, development, manufacturing or marketing skill by limiting the power of the licensor to reject executory contracts").

5 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3200, 3207.

In this motion, if the court determines that Raima UK's rights to use Raima Trademarks under the Raima UK Trademark Agreement are protected under § 365(n), Raima UK, as the licensee, will have two options. *See* William L. Norton, Jr., 6A *Norton Bankr.L. & Prac.2d* § 150:18 (2002). Raima UK can either treat the rejection as a breach and file a prepetition claim for damages, or it can opt to retain its rights under the Raima UK Trademark Agreement notwithstanding the rejection. *See id.* By electing to retain its rights, under § 365(n)(1)(B), Raima UK will continue to enjoy the exclusive rights to market and sell Raima Software under Raima Trademarks in the UK market for the remaining term of the agreement, plus any extension periods.[11] In return, however, Raima UK will not have any right to seek specific performance from Centura U.S. regarding any post-rejection upgrades or patches on Raima Software. *See* Joseph M. Bassano et al., 9C *Am.Jur.2d Bankruptcy* § 2209 (2002). In addition, under § 365(n)(2)(B), Raima UK will continue to pay all license fees under the agreement.[12] Also, pursuant to § 365(n)(2)(C), it will waive its rights to setoff or administrative claim on any post-rejection damages relating to the Raima UK Trademark Agreement.[13] If the court determines that § 365(n) does not protect Raima UK's trademarks rights, Raima UK will not be able to use Raima Trademarks.[14] Although it has elected to retain its § 365(n)-protected rights to market and sell Raima Software (not disputed by Centura US), as far as Raima Trademarks are concerned, it will be left with but a § 365(g) claim for damages resulting from being unable to use the trademarks in its business.[15]

## 1. The Plain Language of § 365(n) Excludes Trademark Licenses

There are no reported cases which directly interpret § 365(n) and analyze its effects on rejected trademark licenses. The plain language of the statute, however, indicates that § 365(n) does not include trademark licenses. In addition, as will be discussed later, the scholarly writings in the subject matter weigh significantly towards the exclusion of trademarks from § 365(n) protection.

Section 365(n) states that a licensee may elect to retain its rights if the rejected license is one of "intellectual property." According to § 101(35A), intellectual property "means" (A) trade secret, (B) invention, process, design, or plant protected under title 35, (C) patent application, (D) plant variety, (E) work of authorship protected under title 17, or (F) mask work protected under chapter 9 of title 17. By using the more limiting term "means" instead of "includes," Congress has deliber-

---

**11.** *See* Canavan, Comment, *Recent Trends in Bankruptcy Law,* 21 Seton Hall L.Rev. at 803 (under IPLBA, licensees of intellectual property are permitted to continue its use of the technology for the duration of the contract, notwithstanding the rejection).

**12.** Noreen M. Wiggins, *The Intellectual Property Bankruptcy Protection Act: The Legislative Response to Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 16 Ru. C.T.L.J. 603, 624 (1990) ("Wiggins, *Legislative Response*").

**13.** *See id.*

**14.** David M. Jenkins, *Licenses, Trademarks, and Bankruptcy, Oh My!: Trademark Licensing And The Perils of Licensor Bankruptcy,* 25 J. Marshall L.Rev. 143, 144 (1991) ("Jenkins, *Perils*").

**15.** *See id.*

ately limited § 365(n) protection only to the intellectual property enumerated by the statute.[16] It has expressly withheld § 365(n) protection from rejected executory trademark licenses.[17]

Consistent with the statutory language, 365(n)'s legislative history also explicitly states that "the bill does not address the rejection of executory trademark, trade name or service mark licenses." S.Rep. No. 505–100th Cong., 2d Sess. 5 at 3206. Although Congress admitted that the rejection of trademark licenses is "of concern" because of the harsh interpretation of § 365 by the *Lubrizol* court, "such contracts raise issues beyond the scope of this legislation." *Id.*

### 2. It Is Inappropriate to Resort to Legislative History When the Statute Is Clear

Raima UK asked the court to weigh the equities and allow it to retain its trademark rights under the rejected Raima UK Trademark Agreement. It argued that, despite the clear language of § 365(n), legislative history to that section reveals that Congress intended to allow "the development of equitable treatment of this [trademark licenses rejection] situation by bankruptcy courts." S.Rep. No. 505–100th Cong., 2d Sess. 5 at 3206. Legislation on the issue was "postponed" because trade-

mark licensing relationships depend "to a large extent on control of the quality of the products or services sold by the licensee" and was in need of more congressional study. *Id.*

■ Although the cited legislative history may suggest the possibility that Congress intended an equitable treatment for rejected trademarks, the language of § 365(n) is unambiguous. If a statute can be interpreted on its face, it is not necessary to delve into its legislative history. *Lomas Mortg. USA v. Wiese,* 998 F.2d 764 (9th Cir.1993). This is because, where the language is clear, judicial inquiry is complete. *Barnhart v. Sigmon Coal Co., Inc.,* 534 U.S. 438, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). Here, the clarity of § 365(n) makes it unnecessary and inappropriate to look into its legislative history. *See id.* Because Congress has unambiguously indicated that trademark licenses are to be excluded from § 365(n), it does not allow the court to weigh the equities of this case.

The court agrees with the dicta in *Gucci v. Sinatra (In re Gucci),* 126 F.3d 380 (2d Cir.1997). Although *Gucci* only determined whether purchasers of a debtor's business had acted in good faith and did not analyze directly the treatment of rejected trademarks, the court suggested that the language of § 365(n) excludes trademarks from its protection.[18] *Id.* at

---

**16.** William L. Norton, Jr., *Norton Bankr.L. & Prac.2d* § 39:57 (2002) (the Code defines intellectual property broadly to protect virtually all types of rights *other than trademarks* ) (emphasis added). *See also* Warren E. Agin, *Drafting the Intellectual Property License: Bankruptcy Considerations,* 9 J. Bankr.L. & Prac. 591 (2000) (§ 365(n) does not provide protection for licenses for the use of a trademark); Richard F. Broude, *Executory Contracts and Unexpired Leases in Bankruptcy,* SC 37 ALI–ABA 553, 608 (1997) (§ 365(n) does not cover the rejection of executory trademark); Law, *IPLBA,* 99 Com. L.J. at 271 (Congress explicitly chose to exclude trade-

marks, trade names, and service marks from the protection of the IPLBA).

**17.** Norton, *Norton Bankr.L. & Prac.2d* § 39:57.

**18.** At the same time, however, the court also stated that the "effects of a rejection of a trademark licensing agreement are a matter that remains to be litigated." *Gucci,* 126 F.3d at 394 n. 1. More significantly, it questioned whether the "transfer of rights in a trademark should not be rescinded as a consequence of rejection, but, should be subject to continued enjoyment by the licensee." *Id.*

394. In its discussion of public policies regarding debtor's intent to terminate trademark licenses, it stated that "Congress specifically excluded trademark licensees from this [§ 365(n)] protection accorded other intellectual property licensees." *Id.* at 394.

To support its argument that the court should balance the equities in this case in its favor, Raima UK relies on *In re Matusalem,* 158 B.R. 514, 521 (Bankr.S.D.Fla. 1993). In *Matusalem,* the court refused to authorize the rejection of a franchise agreement which included the exclusive right to make and market rum using debtor's secret formula and trade name. Looking beyond the language of § 365(n) into its legislative history, the court stated that "the ball is back in the Court's court" and proceeded to weigh the economic benefits of a rejection against its costs. *Id.* Because the court found that rejection would render not only no economic benefit to the estate but also a certainty that the licensee's business would be destroyed, it refused to authorize the rejection. *Id.* at 522. As a result the licensee was allowed to enjoy its rights to both the secret formula and the trademark. *Id.* Although *Matusalem* may, on its surface, seem to support Raima UK's equitable treatment argument, it is not persuasive for two reasons. First, *Matusalem* considered § 365(n) in a pre-rejection context, not—as here—post-rejection. Secondly, *Matusalem's* dicta does not suggest an extension of § 365(n) protection to trademarks upon a balancing of equities.

The Raima UK Trademark Agreement and the franchise agreement in *Matusa-* *lem* both involve trademarks and other protected intellectual property (collectively, "bundle of rights"). There, the court had before it an incredible history of inter-family litigation and regarded the bankruptcy as a bad faith filing, suspected the bona fides of the debtor's business prospects, and most importantly, was asked to decide whether to allow rejection. Here, that decision was made by the stipulated order. The only question for the court to deal with now is what rights Raima UK has in the Raima Trademarks following rejection.

Although § 365(n) is relevant to bankruptcy courts' decisions both before and after rejection, its implications are significantly different. Norton, 6A *Norton Bankr.L. & Prac.2d* § 150:18. While, pre-rejection, § 365(n) is only used as a guide or a factor in the determination of whether a contract should be rejected, it controls the adjudication of the licensee's rights once rejection is approved. *Id.* Although bankruptcy courts are to determine whether contracts should be rejected in view of the licensee's rights under § 365(n), § 365(n) dictates what happens after rejection. *Id.* The court has little choice at that point. The Code itself states that § 365(n) applies "[i]f the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property." Therefore, because § 365(n) governs intellectual property rights post-rejection and it explicitly excludes trademarks, in order to protect their entire bundle of rights, licensees like Raima UK "must assert their rights early in the case, before the franchisor [licensor] receives court approval of its rejection decision."[19] *Id.* The

(quoting Richard Lieb, *The Interrelationship of Trademark Law and Bankruptcy Law,* 64 Am. Bankr.L.J. 1, 37 (1990)). Therefore, while stating that § 365(n) does not cover trademarks, the Second Circuit also brought into question whether the rejection of a trademark licensing agreement, even without

§ 365(n)'s protection, means that the licensee can still continue to use the license. *See id.* This issue is further discussed in section 3.

19. To protect the entire bundle of rights under an intellectual property contract, accord-

licensees must at that time persuade the bankruptcy court to weigh the equities and not to reject the agreement because its trademarks are integrally linked to other intellectual property. *Id.*

Here, unlike the *Matusalem* contract which was pending rejection, the Raima UK Trademark Agreement has already been rejected by stipulation. Therefore, while the *Matusalem* court appropriately weighed the equities of the debtor's business judgment, with an eye towards the licensee's § 365(n) rights, the court has no such business judgment to evaluate here.[20] What is before the court is only the application of § 365(n). Because of the difference in timing, the issue before *Matusalem* is distinguishable from the motion at bar.

More importantly, the court disagrees with Raima UK's interpretation of *Matusalem's* dicta. Raima UK argued that the *Matusalem* court looked beyond the plain meaning of the statute and had, upon a weighing of equities, extended protection

to rejected trademark licenses. When discussing the licensee's post-rejection rights, the court stated:

> Even if rejection was permitted, it would not automatically result in the termination of [licensee's] exclusive rights within its territorial area to the secret process and formulas used to make rum products or [licensee's] exclusive rights to manufacture and sell these products within its territorial area.... Thus, rejection under § 365(n) would not deprive [licensee] of its rights under the franchise agreement. *Matusalem*, 158 B.R. at 522.

Nowhere in the dicta, however, did the *Matusalem* court extend § 365(n) protection to trademarks. It only stated that, upon rejection, the licensee could continue to use the § 365(n)—protected secret recipe to exclusively manufacture and sell rum. It did not mention that the licensee could retain any rights to use its trademarks.[21] In fact, later, it even stated that

---

ing to Norton, timing is important. To shield its trademark rights, the licensee must intervene before the court approves of the debtor's *efforts to reject the agreement.* Assuming the bankruptcy court applies a business judgment test in adjudicating whether a contract should be rejected, the issue before the bankruptcy court at that time would be whether the debtor's business judgment supports the rejection of the agreement in view of the licensee's right under § 365(n), namely the right to continue using the protected intellectual property without the related trade name. At that time, the licensee should argue that the relatedness of the trade name to the protected property should allow it to "bootstrap ongoing trademark rights through an application of the business judgment rule," notwithstanding the Bankruptcy Code's exclusion of trademarks. Norton, 6A *Norton Bankr.L. & Prac.2d* § 150:18.

**20.** When evaluating debtor's rejection request, the *Matusalem* court properly considered the licensee's trademark rights under § 365(n) in its business judgment test. Ex-

plaining one of its rationales for denying debtor's request, the court stated that "the Debtor has failed to demonstrate good business judgment or even *mediocre* business judgment. There is no economic benefit to the estate and its unsecured creditors from a rejection of [licensee's] franchise agreement either under the court's interpretation of § 365(n) or under the Debtor's interpretation of it." 158 B.R. at 522.

**21.** Professor Klee interpreted *Matusalem's* dicta as a conclusion that § 365(n) is controlling where a trademark is integrally linked to a protected intellectual property. Kenneth N. Klee, *The Effects of Bankruptcy on Intellectual Property Rights,* SG001ALI ABA 407, 412 (2001). His analysis appears to be based on a misunderstanding of what the court said. He assumed that the rights referred to included the licensee's trademark rights. He stated, "These rights presumably included the non-debtor licensee's right to the continued use of the debtor's trademark." *Id.* Because the rights the *Matusalem* court referred to includ-

the rejection would "make the Debtor potentially liable for a rejection claim," implying that the licensee would be entitled to file a breach claim for losing its trademark rights. *Id.*

In addition, because alternative grounds existed for its holding, the court disagrees that the *Matusalem* court denied the rejection on the basis of § 365(n)'s legislative history.[22] Other reasons for the denial included the court's determination that a rejection would be of bad business judgment. *See id.* at 522. It could also have denied the rejection solely because the debtor had filed for bankruptcy in bad faith. *Id.* Further, *Matusalem* did not mention § 365(n)'s exclusion of trademarks or discuss any post-rejection quality control concerns raised by Congress.[23] For these reasons, Raima UK cannot rely on *Matusalem's* dicta to protect its rejected trademark licenses. Because § 365(n) is controlling post-rejection and it does not protect trademarks, the court holds that Raima UK cannot retain any trademark rights under the rejected Raima UK Trademark Agreement. It cannot continue to use Raima Trademarks in its sale of Raima Software but, as discussed in the next section, it is entitled to file an unse-cured pre-petition claim for damages resulting from not being able to use such trademarks.

### 3. The Rejected Trademarks Entitle Raima UK to a § 365(g) Claim For Breach

██ At the hearing, Raima UK partly relied on *Gucci's* footnote, quoted in footnote 18 above, that despite the rejection of a trademark license and lack of § 365(n) protection, the licensee may still continue to use the trademark. *See* 126 F.3d at 394 n. 1. In an article cited by the *Gucci* court, Mr. Richard Lieb suggested that "the transfer of rights in a trademark should not be rescinded as a consequence of rejection, but, should be subject to continued enjoyment by the licensee." Lieb, *The Interrelationship of Trademark and Bankruptcy Law*, 64 Am. Bankr.L.J. at 37. However, Mr. Lieb did not support his statement with any authority. In fact, both pre and post-amendment cases as well as scholarly writings suggest that, upon the rejection of a trademark license, *Lubrizol's* harsh holding controls, and the licensee is left with only a claim for breach.[24]

ed only the rights protected by § 365(n), Professor Klee's reliance was misplaced.

**22.** *See* Stuart M. Riback, *The Interface of Trademarks and Bankruptcy*, 387 PLI/Pat 53, 75 (1994) (cautioning that the *Matusalem* court could have rested its holding that rejection was improper entirely on alternative grounds articulated in the opinion and the peculiar facts of the case, it is therefore unclear if its holding will have any impact beyond the court that decided it).

**23.** *See* Madlyn Gleich Primoff, *E–Commerce and Dot–Com Bankruptcies: Assumption, Assignment and Rejection of Executory Contracts*, 8 Am. Bankr.Inst. L.Rev. 307, 344 (2000) (the *Matusalem* Court did not address the fact that trademarks are plainly not subject to § 365(n) protection, so a trademark licensee cannot rely exclusively on § 365(n) to prevent rejection by a trustee from stripping it of its right under its license). *See also* Stuart M. Riback, *Intellectual Property Licenses: The Impact of Bankruptcy*, 672 PLI/Pat 201, 211 (2001) (the dictum did not mention or discuss the issues of post-rejection quality control and have "sunk without a trace . . . so it would seem that the *Lubrizol* analysis continues to govern licensor rejection of trademark licenses").

**24.** *See* Riback, *Intellectual Property Licenses: The Impact of Bankruptcy*, 672 PLI/Pat at 211 ("the *Lubrizol* analysis continues to govern licensor rejection of trademark licenses"). *See also* Jenkins, *Perils*, 25 J. Marshall L.Rev. at 144 (unprotected by § 365(n) from the harsh *Lubrizol* treatment, rejection of trademarks extinguishes the licensee's rights to use them, giving rise to devastating conse-

For example, in *In re Chipwich, Inc.*, 54 B.R. 427 (Bankr.S.D.N.Y.1985), a pre § 365(n) case, the court authorized the rejection of licenses to produce and sell dairy products under debtor's trademark. Notwithstanding "the obvious adverse consequences for contracting parties thereby made inevitable," the court followed *Lubrizol* and rejected the trademark, holding that "equitable considerations may not be indulged by courts." *Id.* at 431 (quoting *Lubrizol*, 756 F.2d at 1048). Like *Lubrizol*, it stated that the rejection left the licensee with only an allowable claim for damages resulting from debtor's breach of agreement under § 365(g)(1).[25] *Id.* at 431.

More significantly, *Lubrizol's* holding that rights under an executory contract are terminated upon rejection was also followed in a post-amendment trademark case. In *Blackstone Potato Chip Co, Inc. v. Mr. Popper, Inc. (In re Blackstone Potato Chip Co., Inc.)*, 109 B.R. 557 (Bankr. D.R.I.1990), the court authorized the rejection of a trademark license, noting that any rejection will inevitably entail the disappointment of legitimate expectations. Without discussing § 365(n), the court approved the rejection based on an application of the business judgment test. *Id.* It then relied on *Lubrizol* and stated that, upon rejection, the licensee was left with no rights to use the trademarks. *Id.* at 562. Rather, the court held that it was entitled to only a general unsecured claim for the debtor's breach of its executory contract.[26] *Id.*

## IV. CONCLUSION

Because Raima UK had failed to bring forth undisputed evidence that Centura UK was Centura US' actual or ostensible agent, the court is unable to determine, as a matter of law, that Centura U.S. was bound by the Centura UK Agreement. Therefore, despite the finding that, had Centura U.S. been bound, Raima UK would have been able to set off Centura UK's unpaid fees against the minimum license fees it owed Centura US, the court must nevertheless deny Raima UK's Setoff Rights Motion.

Because § 365(n) plainly excludes trademarks, the court holds that Raima UK is not entitled to retain any rights in Raima Trademarks under the rejected Raima UK

quences); Wiggins, *Legislative Response*, 16 Ru. C.T.L.J. at 613 (though not involving trademarks, *Lubrizol* has nonetheless been significantly relied upon both before and after the 1987 amendment, especially in cases dealing with rejection of technology agreements not covered by § 365(n)).

**25.** *See* Wiggins, *Legislative Response*, 16 Ru. C.T.L.J. at 614 (although the *Chipwich* decision on trademarks was rendered before the enactment of § 365(n), its practical result "remains unaffected by the changes Congress made to section 365 since the definition of intellectual property in the 1987 amendment does not include trademarks").

**26.** There is significant consensus among courts and scholars regarding the licensee's rights under a rejected trademark license. *See* Michael T. Andrew, *Executory Contracts*

in Bankruptcy: Understanding "Rejection", 59 U. Colo. L.Rev. 845, 919 (1988) (unless protected by § 365(n), the rejection of a technology contract is to be treated as if the debtor has broken a promise and will not perform its obligations, thereby giving the non-debtor a basis for a breach claim under § 365(g)); Norton, 6A *Norton Bankr.L. & Prac.2d* § 150:18. (because § 365(n) does not apply to trademarks, once a trademark license is rejected, the licensee cannot continue using the trademark and is left with a general unsecured claim against the debtor's bankruptcy estate); Riback, *The Interface of Trademarks and Bankruptcy*, 387 PLI/Pat at 66 (rejection of a trademark license can potentially destroy licensee's business because it is deemed to be a prepetition breach by the debtor and only gives rise to a prepetition claim for damages under §§ 365(g) and 502(g); specific performance is not an available remedy).

Trademark Agreement. As a result of the rejection, Raima UK's remedy was to file a claim under § 365(g) for its damages resulting from the breach.

Therefore, the court hereby denies Raima UK's Setoff Rights Motion and grants Centura and the Committee's 365(n) Motion.

The court is concurrently herewith entering orders disposing of the two motions as set forth above. In view of the disposition of these two motions, the court will conduct a status conference to discuss with counsel the future of this adversary proceeding. That status conference will take place on August 30, 2002, at 2:30 P.M. The parties do not need to file status conference statements prior to the hearing.